ARTHUR M. YOUNG AND RUTH F. YOUNG, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60144.   Filed February 17, 1958.

*Andrew B. Young, Esq.*, and *David P. Brown, Jr., Esq.*, for the petitioners.

*Edward L. Newberger, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in petitioners' income taxes and additions to tax as follows:

| Year | Deficiency | Additions to tax, sec. 294 (d) (2) |
|------|-----------|------------------------------------|
| 1951 | $7,855.11 | $818.87 |
| 1952 | 21,146.18 | |
| 1953 | 32,790.49 | |

Petitioners dispute respondent's determination that certain patent royalty payment receipts were ordinary income and not capital gains.

### FINDINGS OF FACT.

Some of the facts are stipulated and as stipulated are adopted as findings of fact.

Petitioners filed a joint income tax return for the year 1951 with the then collector of internal revenue for the Upper Manhattan district of New York, New York.

Petitioners filed a joint income tax return for the year 1952 with the director of internal revenue for the Lower Manhattan district of New York, New York.

Petitioners filed a joint income tax return for the year 1953 with the director of internal revenue for the Upper Manhattan district of New York, New York.

Over a period of years starting in 1928, petitioner Arthur M. Young, hereinafter referred to as Young, developed certain inventions in the field of helicopter aviation. He patented some of these inventions and wanted to find someone who could invest sufficient funds in them to be able to put the inventions into practical use. Young began negotiating in 1941 with the Bell Aircraft Corporation, hereinafter referred to as Bell, for the exploitation of the inventions contained in the patents.

Young was not prepared to sell outright his patents because he was fearful that the purchaser might not develop the inventions or put them to practical use. Failure to put his inventions to practical use would mean a loss of his work up to that point and force him to begin work again on other inventions. Bell, however, was interested in purchasing the complete title to the patents. Bell was not willing to take a mere license in the patents because it knew it would require a substantial investment to exploit the patents, and a mere license would be little security for the risk Bell was willing to take.

On November 1, 1941, Young was the owner of certain helicopter patents issued to him by the United States Patent Office, and had applied for certain other helicopter patents as follows:

| Patent No. | Issued |
|-----------|--------|
| 1,915,209 | June 20, 1933 |
| 2,082,674 | June 1, 1937 |
| 2,256,635 | Sept. 23, 1941 |
| 2,256,918 | Sept. 23, 1941 |

# 852

Application No.                                                  Filed
373,673_____ Jan. 8, 1941
329,867_____ Apr. 16, 1940

On November 1, 1941, petitioner entered into an agreement with Bell whereby he, Young, agreed to assign full right, title, and interest in the above helicopter patents and patent applications and inventions disclosed in the patents and patent applications, and any future helicopter patents and inventions he, Young, might make during the existence of the agreement. Bell was to have full right to grant licenses and sublicenses, and to manufacture and practice the patents throughout the world. Petitioner was to receive designated royalty payments on sales of the patented devices manufactured by Bell or any licensee of the patents granted Bell.

The agreement disclosed that Bell was a member of the Manufacturers' Aircraft Association, Inc., hereinafter referred to as M. A. A. The agreement was made subject to a cross-license agreement which existed between Bell and M. A. A. The agreement between Young and Bell provided termination rights for either party as follows:

IV. Upon the termination of this agreement at any time or in any manner, BELL shall reassign, and BELL agrees to reassign, to YOUNG all of the patents, applications and inventions referred to in Paragraph II theretofore assigned by YOUNG to BELL; and further agrees to reassign to YOUNG all of the interest of YOUNG in inventions hereafter made and which shall have been assigned by YOUNG to BELL in accordance with Paragraph III; provided, however, that with respect to such inventions as to which disclosures are made more than two months after the date hereof, BELL shall have a shop right license therein notwithstanding any reassignment to YOUNG; and provided further that, in the case of all inventions jointly made by YOUNG and an employee of BELL, BELL shall not be required to reassign to YOUNG, but shall give to YOUNG a nonexclusive indivisible license to manufacture, sell and use such joint invention, for Helicopters only, which license shall be upon and subject to the same terms and conditions as obtain with respect to licenses under said invention in favor of subscriber members of the Manufacturers' Aircraft Association; the said license to YOUNG shall be assignable; and if at any time the license in the hands of YOUNG or an assignee shall be inactive, one sublicense may be granted.

    *        *        *        *        *        *        *

XVI. This agreement is subject to termination at the end of the first year by BELL alone. At the end of the second year, this agreement may be terminated by either party upon thirty (30) days' prior notice in writing to the other given; and, if not then so terminated, at any time thereafter either party may terminate the agreement by giving six (6) months' notice in writing to the other. In the absence of termination as provided for by this paragraph, this agreement shall run until the expiration of the last patent subject to this agreement.

XVII. Upon termination of this agreement and the reassignment to YOUNG of inventions, patents and applications falling within the terms of this agreement as hereinbefore prescribed, then any licenses theretofore issued to members of Manufacturers' Aircraft Association shall continue in full force and effect, but payments of royalties thereunder shall thereafter be made to YOUNG

instead of to BELL, and BELL shall forthwith advise Manufacturers' Aircraft Association of said termination and the date thereof. It is further agreed that in the event of such termination of the agreement, and reassignment of inventions, patents and applications to YOUNG, Young shall grant to BELL a license under any patents so reassigned under the same terms and conditions as obtain in the case of licenses to members of Manufacturers' Aircraft Association under such patents. As to any inventions made, either solely or jointly, by YOUNG within twenty (20) years after the termination of this agreement, YOUNG shall grant to BELL a nonexclusive license thereunder, and such license shall be on no less favorable terms than given to any other licenses under said invention.

*Provided, however,* that if this agreement shall be terminated by Young during his lifetime, and Young or his estate shall thereafter receive royalties or other compensation for the inventions reassigned to him as above prescribed, then Young or his estate shall pay to Bell 20% of all such monies received from members of Manufacturers Aircraft Association and 10% of all such monies received from non-members of said association; and in the event that it shall be terminated after Young's death by those then having the right so to do, then Bell shall receive one-half of such monies thereafter so paid by such members and non-members of Manufacturer's Aircraft Association. This proviso shall not apply, however, in the event of the termination of this agreement by Bell at any time.

Bell was to control all patent infringement suits against any licensee or others on patents covered by the agreement and to bear the expenses of the litigations. Young was required to cooperate in all patent infringement suits. Bell was to be compensated for these expenses out of any recoveries secured as a result of the litigations.

The pertinent provisions of the cross-license agreement incorporated in the main agreement provided as follows:

### II. Licenses and Powers Granted.

The "Subscribers" grant, agree to grant and cause to be granted to each other, licenses to make, use and sell airplanes—under all airplane patents of the United States now or hereafter owned or controlled by them or any of them, or by any firm, corporation or association owned or controlled by them or under which they or any of them, or any such firm, corporation or association, have or shall have the right to grant licenses—in and throughout the United States, its territories and dependencies, for use therein or abroad, except that no rights, express or implied, are hereby granted under any foreign patents, nor shall said rights or the license herein provided for, apply to or include the use of said patents in their application to other than airplanes.

All licenses provided for herein shall run to the full end of the term of the letters patent under which the license is or is to be granted and shall be personal, indivisible, non-assignable and irrevocable, except for the causes and in the manner hereinafter stated.

The "Subscribers" hereby designate, constitute and appoint the "Company" (and the "Company" hereby accepts the appointment) as their true, sufficient and lawful agent and attorney in fact, for them and in their respective names, to make and execute licenses in writing in the form hereto annexed, and to deliver the same to those of the "Subscribers" who, at the time, are stockholders of the "Company" not in default hereunder and who shall have executed an agreement in writing of like tenor to this, and to enforce said licenses and any

and all other obligations (including the obligation to make payments) of the "Subscribers" under this Agreement and the "Subscribers" hereby give and grant unto said "Company" as full, complete and ample power and authority in the premises as the "Subscribers" themselves now have and possess.

\*  \*  \*  \*  \*  \*  \*

### III. Covenants of Further Assurance.

(a) Each "Subscriber" now or hereafter, having rights under any United States airplane patent or invention, of such character that it has legal right and power to procure the grant of rights thereunder to others, but is not itself empowered to grant such rights, covenants to procure the execution of such further instrument as may be necessary to empower the "Company" to grant rights under such patent, or with reference to such invention, to the extent and in the manner herein provided.

(b) Each "Subscriber" covenants that it will not contract for or obtain any rights under any such patent or invention in such manner that its owner would be prevented from granting to other "Subscribers" hereto similar rights on the same terms unless the "Subscriber" obtains, at the same time, the further privilege to grant rights under said patent or said invention, whereby the same may and will be brought under the operation of this agreement.

\*  \*  \*  \*  \*  \*  \*

### V. After Acquired Patents.

When a "Subscriber" shall hereafter acquire a United States airplane patent, or any right thereunder, he shall be entitled to compensation for the use thereof if the patent or patent right covers an invention which secures the performance of a function not before known to the art or constitutes an adaptation for the first time to a commercial use of an invention known to the industry to be desirable of use but not used because of lack of adaptation, or is otherwise of striking character or constitutes a radical departure from previous practice, or if either the price paid therefor or the amount expended in developing the same is such as to justify such compensation, provided that at the time said patent or patent right is reported to the "Company" as required in subdivision (b) of Paragraph VI, the "Subscriber" claims such compensation and states the grounds on which such claim is based. Such report and claims shall be submitted to a Board of Arbitration to be selected in the manner provided for in Paragraph XIV hereof which Board shall determine whether such compensation shall be paid, and if so, the total amount thereof and the rate of royalty, or other payments which shall be paid (toward such compensation) by each "Subscriber" upon the issuance of a license under said patent and the use by any "Subscriber" of the subject matter covered by said patent, and shall also fix the time or times when said royalties or other amounts shall be paid. Licenses shall be issued to each "Subscriber" as a matter of course, through the offices of the "Company" within thirty days (30 days) after the rendition by such Board of Arbitration of its final report, whether or not compensation, under such after acquired patent, is or is not required to be paid.

\*  \*  \*  \*  \*  \*  \*

### VII. Payments to the "Company".

Each "Subscriber" agrees to pay into the treasury of the "Company" on the 10th days of January, April, July and October in each year the following sums of money, to wit:

(a) On each airplane, with or without engine, required to be reported as provided, in sub-division (c) of Paragraph VI hereof, the sum of two per cent (2%) of the selling price of such airplane, with a maximum of Two Hundred Dollars ($200) on any one airplane regardless of its cost or selling price until such time as the Curtiss Airplane & Motor Company, Inc., shall have been paid the aggregate sums provided for in Paragraph VIII hereof, or until United States Patent No. 1,303,550 issued October 31, 1916 shall have expired.

\*    \*    \*    \*    \*    \*    \*

### VIII. Payments by the "Company".

Out of the monies paid into the treasury of the "Company" pursuant to the provisions hereof and of the predecessor agreements hereinabove mentioned, the following payments shall be made by the Company on the 20th days of January, April, July and October in each year, to wit:

\*    \*    \*    \*    \*    \*    \*

(b) To each of the "Subscribers" entitled thereto such amounts as may have been paid to the "Company" with relation to the use of after acquired patents in accordance with Sub-division (c) of Paragraph VII, subject to the reservation in sub-division (a) of Paragraph IX.

\*    \*    \*    \*    \*    \*    \*

### XII. Withdrawal From Agreement.

Any "Subscriber" may withdraw from this Agreement at any time after one (1) year after executing and delivering it, providing that written notice of its election to do so shall be given to the "Company" at least thirty (30) days in advance of the date when the next quarterly report is required to be filed under sub-division (c) of Paragraph VI hereof and on fulfilling all of its obligations up to the date of such withdrawal, but no withdrawal shall relieve the other parties and other "Subscribers" from their obligations to each other hereunder, nor deprive them of their rights acquired under the patents and patent rights owned or controlled by the withdrawing "Subscriber" at the time of withdrawal, all of said patents and patent rights remaining under this Agreement, but such withdrawing "Subscriber" shall cease to have any rights under the patents of the other "Subscribers" hereto, or any other right under this Agreement, from and after such withdrawal.

On January 23, 1942, petitioner executed assignments to Bell with respect to each of the above patents and applications by separate instruments designated as "Assignment," each of which documents was recorded in the United States Patent Office on January 31, 1942.

On March 1, 1944, petitioner Arthur M. Young entered into a new agreement with Bell which was in termination and substitution of the prior agreement of November 1, 1941. This agreement also was subject to the cross-license agreement between M. A. A. and Bell. The new agreement was similar to the old agreement in most respects. The termination rights were as follows:

XII. This agreement may be terminated by either party at any time following six (6) months' notice in writing by one party to the other.

XIII. Upon the termination of this agreement, BELL shall reassign to YOUNG all Letters Patent, applications therefor and inventions which have been assigned by YOUNG to BELL prior to the date of such termination; and provided

further that, in the case of all inventions jointly made by YOUNG and an employee of BELL, BELL shall not be required to reassign to YOUNG, but shall give to YOUNG a non-exclusive indivisible license to manufacture, sell and use such joint invention, which license shall be upon and subject to the same terms and conditions as obtain with respect to licenses under said invention in favor of subscriber members of the Manufacturers' Aircraft Association, and in the case of inventions not covered by said Manufacturers Aircraft Association cross-license agreement, such license shall be upon terms and conditions not less favorable than have been or may be granted by BELL to other licensees thereunder; the said license to YOUNG shall be assignable; and if at any time the license in the hands of YOUNG or an assignee shall be inactive, one sub-license may be granted.

XIV. Upon the termination of this agreement and the reassignment to YOUNG of inventions, patents and applications therefor, falling within the terms of this agreement as hereinabove provided, any licenses theretofore issued to subscribers of Manufacturers Aircraft Association, Inc. and/or others shall continue in full force and effect; payments of royalties thereunder shall thereafter continue to be made to BELL and BELL shall continue to pay to YOUNG fifty percent (50%) of all such royalties and other payments so received by BELL as provided in paragraph VI hereof. After such termination of this agreement YOUNG further agrees to pay to BELL fifty per cent (50%) of all royalties and other payments received by YOUNG for the use of inventions claimed or described in applications for patents filed by YOUNG during the term of his employment by BELL and for three years thereafter; except that with respect to any royalties or payments received by YOUNG from non-members of said Manufacturers Aircraft Association, Inc. upon licenses issued before such termination, YOUNG agrees to pay to BELL seventy percent (70%) thereof, and with respect to such licenses to non-members of said Manufacturers Aircraft Association issued subsequent to such termination, YOUNG agrees to pay to BELL thirty per cent (30%) thereof. It is agreed that "royalties" or "other payments" shall be deemed to include all proceeds of patents whether by royalty, sale or otherwise.

XV. It is further agreed that in the event of such termination of this agreement and reassignment of such inventions, patents and applications therefor to YOUNG, YOUNG shall grant to BELL licenses under the patents so reassigned under terms and conditions determined as follows: With respect to patents falling within the provisions of Manufacturers Aircraft Association cross-license agreement, upon the same terms and conditions as obtain in the case of licenses to members thereof; under patents not falling within the provisions of such cross-license agreement, upon terms not less favorable than have been or may be granted to any other licensee, and if no license shall be outstanding under any such patent, then at a royalty of one per cent (1%) of the net selling price thereof, it being understood that the license fee payable by BELL shall be no less favorable than the license fee theretofore or thereafter paid by other licensees.

As to any inventions made, either solely or jointly, by YOUNG in the field currently covered by the Manufacturers Aircraft Association cross-license agreement and/or the then current manufacturing activities of BELL, within twenty (20) years after the termination of this agreement, YOUNG shall grant to BELL a non-exclusive license thereunder, and such license shall be on no less favorable terms than given to any other licensee under said invention.

Bell was to control all patent infringement suits against any licensee or others on any patent within the agreement so long as Bell holds

title thereto, and to bear the expenses of litigation with the right to be compensated out of any recoveries secured as a result of the litigation. Again, Young's cooperation was required in all patent infringement suits.

On the following dates petitioner Arthur M. Young executed assignments to Bell by separate instruments designated as "Assignment of Invention" pertaining to aircraft and helicopter improvements, each of which documents was recorded in the United States Patent Office as follows:

| Patent No. | Date recorded | Recorded in U. S. Patent Office in— | |
|---|---|---|---|
| | | Liber No. | Page |
| 2,368,698 | Mar. 10, 1943 | O195 | 162 |
| 2,367,916 | Sept. 18, 1943 | E197 | 426 |
| 2,457,429 | May 9, 1945 | B203 | 154 |
| 2,510,006 | Apr. 5, 1946 | N206 | 525 |
| 2,615,657 | Aug. 28, 1946 | N208 | 130 |
| D–150,186 | Nov. 14, 1946 | L209 | 500 |
| D–150,665 | Nov. 14, 1946 | L209 | 502 |
| D–150,483 | Nov. 15, 1946 | M209 | 179 |
| 2,646,848 | Feb. 18, 1947 | O210 | 57 |
| 2,589,316 | Nov. 12, 1947 | U213 | 512 |
| 2,633,924 | Feb. 26, 1948 | C215 | 201 |

The March 1, 1944, agreement was modified by three later agreements which dealt with royalty rights. During the years in question, petitioner received the following sums from Bell as royalties under the agreement:

| Year | Gross receipts | Net receipts |
|---|---|---|
| 1951 | $32,069.70 | $29,082.61 |
| 1952 | 69,483.07 | 64,966.67 |
| 1953 | 107,190.13 | 100,222.77 |

Petitioners reported the net receipts as capital gains on their income tax returns. Respondent determined that the agreement between petitioner Arthur M. Young and Bell constituted a license arrangement and that the royalties received by petitioner were ordinary income.

### OPINION.

Petitioners contend that the agreement between Young and Bell constitutes a sale of the patents covered by the agreement, within the purview of section 117 (q)[1] of the Internal Revenue Code of 1939, and

---

[1] Act of June 29, 1956, ch. 464, 70 Stat. 404.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 117 of the Internal Revenue Code of 1939 (relating to capital gains and losses) is hereby amended by adding at the end thereof a new subsection as follows:

(q) TRANSFER OF PATENT RIGHTS.—

(1) GENERAL RULE.—A transfer (other than by gift, inheritance, or devise) of prop-

that, therefore, the royalties received as a result of the agreement in the years in question are taxable as capital gains.

We do not agree with the petitioners. A conveyance of a patent will be a sale or exchange of a capital asset held for more than 6 months within the purview of section 117 (q) if there is a transfer of "all substantial rights or an undivided interest therein which includes a part of all such rights" to a patent. The substantial rights in a patent are generally the exclusive rights for a term of 17 years to make, use, and vend the patent throughout the United States and territories thereof. *Waterman v. Mackenzie*, 138 U. S. 252 (1891). A sale or assignment of such rights can be effected by the conveyance of either, first, the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or, second, an undivided part or share of that exclusive right; or, third, the exclusive right under the patent within and throughout a specific part of the United States. Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement. *Waterman v. Mackenzie, supra* at 255; followed, *United States v. General Electric Co.*, 272 U. S. 476 (1926); *Lynne Gregg*, 18 T. C. 291 (1952), affd. 203 F. 2d 954 (C. A. 3, 1953).

Young, by the terms of the agreement, has retained the right to terminate the agreement at any time following 6 months' notice to Bell. The specific requirement of a 6 months' prior notice must be satisfied before Young could terminate, *E. C. Atkins & Co. v. Parke*, 61 F. 953 (C. A. 6, 1894), but the notice itself could be sent at any time Young so desired. The agreement then was not an abso-

---

erty consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

    (A) payable periodically over a period generally coterminous with the transferee's use of the patent, or

    (B) contingent on the productivity, use, or disposition of the property transferred.

  (2) "HOLDER" DEFINED.—For purposes of this subsection, the term "holder" means—

    (A) any individual whose efforts created such property, or

    (B) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—

      (i) the employer of such creator, nor

      (ii) related to such creator (within the meaning of paragraph (3)).

  (3) EXCEPTIONS.—This subsection shall not apply to any transfer described in paragraph (1)—

    (A) by a nonresident alien individual; or

    (B) between an individual and any related person. For purposes of this paragraph, the term "related person" means a person, other than a brother or sister (whether of the whole or half blood), with respect to whom a loss resulting from the transfer would be disallowed under section 24 (b).

  (4) APPLICABILITY.—This subsection shall apply with respect to any amount received, or payments made, pursuant to a transfer described in paragraph (1) in any taxable year beginning after May 31, 1950, regardless of the taxable year in which such transfer occurred.

lute transfer of the exclusive rights for the terms of the patents, to make, use, and vend the inventions covered by the patents. Since it was not a transfer of the exclusive rights for the term of the patents, it was not a transfer of the entire right, title, and interest in them and, therefore, not a sale or assignment. *Waterman* v. *Mackenzie, supra.*

An exception to the above rule is the case where the transferor retains the right to terminate the conveyance, upon the happening of a future event over which he has no control, as in the case of a failure to pay royalties or for nonperformance on the part of the transferee. Such a provision is deemed a condition subsequent which will not defeat the sale. *Edward C. Myers*, 6 T. C. 258 (1946); followed, *F. H. Philbrick*, 27 T. C. 346 (1956); *Roy J. Champayne*, 26 T. C. 634 (1956). See also *Lawrence* v. *United States*, 242 F. 2d 542 (C. A. 5, 1957); *Lamar* v. *Granger*, 99 F. Supp. 17 (W. D. Pa., 1951). Young's right to terminate at will is not dependent upon the happening of some future event over which he has no control and is, therefore, not a condition subsequent.

The legislative history of section 117 (q) of the 1939 Internal Revenue Code emphasizes this very result. Section 117 (q) was not enacted until June 29, 1956, and then to alleviate the confusion which existed as a result of a revenue ruling. Section 1235 of the 1954 Internal Revenue Code was the model used for section 117 (q). Section 1235 was prospective in effect, being applicable only to years to which the 1954 Code applies. The legislative history of section 117 (q), enacted in 1956, clearly indicates an intention to extend retroactively the substance of the 1954 provision.

The legislative explanation for section 117 (q) was as follows:[2]

Prior to the enactment of the 1954 Code, there was no special provision relating to the sale or exchange of rights to a patent. The determination of what constituted a "sale" and what constituted a mere "license" was determined under general principles of law. The Tax Court held that certain agreements where the purchase price is conditioned on the use or profitability of the invention constituted a sale in *Edward C. Myers* (6 T. C. 258 (1946), Acq. 1946–1 C. B. 2 Non. Acq. 1950–1 C. B. 7). The general principle established by this decision was recently accepted (and the Internal Revenue Service's position rejected) in *United States* v. *Carruthers* (219 F. 2d 21 (9th Cir. 1955)). The Government's nonacquiescence in Myers raised a doubt concerning numerous existing and future contracts and was one of the reasons for the enactment of section 1235. This section provides that a transfer of all substantial rights to a patent (or an undivided interest therein) is to be considered as the sale or exchange of a capital asset held for more than 6 months whether or not payments are to be made periodically during the period of the transferee's use of the patent and whether or not the payments are contingent on the productivity, use, or disposition of the property transferred. The relief provided was limited to holders of the patent, defined as the individual whose efforts

[2] Report of the Committee on Ways and Means, House of Representatives, to accompany H. R. 6143, H. Rept. No. 1607, 84th Cong., 1st Sess.

created the property transferred, i. e., the inventor, or an individual (other than an employer or a relative) who acquired his interest in the property in exchange for money paid to the creator prior to the actual reduction to practice of the invention.

The rule enacted in section 1235 was applicable with respect to amounts received in any taxable year to which the 1954 Code applied, regardless of the year in which the transfer occurred. While this provision removed the previous uncertainty in the law for the inventors and other persons covered by the section, the Internal Revenue Service has announced (Revenue Ruling 1955–58) that it will adhere to its position for years beginning after May 31, 1950, and prior to the effective date of the 1954 Code. Thus, payments received from such transactions in these years would continue to be treated as ordinary income by the Internal Revenue Service rather than as capital gain to the transferor.

This bill adds a new subsection to section 117 of the 1939 Code which is substantially the same as section 1235 of the 1954 Code. This subsection is to apply to payments made, and amounts received, in years to which the 1939 Code applies, beginning after May 31, 1950.

When section 1235 was originally enacted, it was stated in the committee report that there was no intention of affecting the operation of existing law in those areas outside the scope of the section, and no inference was to be drawn from section 1235 as to what constituted a "sale or exchange" in the case of transfers not within the scope of the section. Similarly, no inference is to be drawn from the enactment of this bill.

Congress, while enacting section 1235, stated: [3]

The section does not detail precisely what constitutes the formal components of a sale or exchange of patent rights beyond requiring that all substantial rights evidenced by the patent (other than the right to such periodic or contingent payments) should be transferred to the transferee for consideration. * * * The word "title" is not employed because the retention of bare legal title in a transaction involving an exclusive license may not represent the retention of a substantial right in the patent property by the transferor. Furthermore, retention by the transferor of rights in the property which are not of the nature of rights evidenced by the patent and which are not inconsistent with the passage of ownership, such as a security interest (e. g., a vendor's lien) or a reservation in the nature of a condition subsequent (e. g., a forfeiture on account of nonperformance) are not to be considered as such a retention as will defeat the applicability of this section. *On the other hand, a transfer terminable at will by the transferor would not qualify.* [Emphasis added.]

The statement found in the committee reports with respect to section 1235 that "a transfer terminable at will by the transferor would not qualify" is equally applicable to transfers within section 117 (q).

Petitioners argue that the agreement is so constituted that Young would receive little or nothing of substantive value upon termination and that he was economically precluded from terminating. Therefore, petitioners maintain that he did, in fact, transfer all substantial rights in the patents within the purview of section 117 (q) of the 1939 Internal Revenue Code. Petitioners' argument is based on the facts that, upon termination of the agreement, Bell and all members of M. A. A., which comprise nearly all manufacturers and businesses

[3] Report of the Committee on Finance, United States Senate, to accompany H. R. 8300, S. Rept. No. 1622, 83d Cong., 2d Sess., p. 49S.

in the field of aviation, would retain their license interest in the patents; the royalties to be paid by Bell would be greatly reduced; and Young would have to bear all expenses for patent infringement litigations.

We do not deem these facts sufficient on which to base a finding that no substantial right was retained by Young. Even though he would be burdened with the expenses of patent infringement suits, Young would be vested on termination with sole right to sue in his own name for patent infringement, which right can be of great economic value, and is considered as the primary indicia of true ownership of a patent. *Waterman* v. *Mackenzie, supra; Hook* v. *Hook & Ackerman*, 187 F. 2d 52 (C. A. 3, 1951) ; *Preload Enterprises* v. *Pacific Bridge Co.*, 86 F. Supp. 976 (D. Del., 1949) ; *Kenyon* v. *Automatic Instrument Co.*, 63 F. Supp. 591 (W. D. Mich., 1945). Also, Young, upon termination, would possess a sufficient interest in the patents to be capable of assigning an exclusive right, title, and interest, subject to the then outstanding licenses, to an enterprise which might have at its disposal far greater manufacturing capacity and sales potential than the combined capacity of Bell and all M. A. A. members. Such an assignment could produce royalty receipts much larger than Young is presently receiving.

The agreement between Young and Bell does not constitute a transfer of all substantial rights in the patents within the purview of section 117 (q) of the 1939 Code. The royalties received by Young are not from a sale or exchange of a capital asset, but from a license granted by Young to Bell to use that asset, subject to termination at the will of the transferor. Therefore, the royalties received are taxable as ordinary income. *Lynne Gregg, supra.*

*Decision will be entered under Rule 50.*