THE TAYLOR-WINFIELD CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 796–68, 1184–70. Filed November 8, 1971.

*Thomas M. Haderlein* and *John C. Klotsche*, for the petitioner.
*Larry L. Nameroff*, for the respondent.

WITHEY, *Judge:* In these consolidated cases, respondent determined deficiencies in petitioner's income tax as follows:

| Docket No: | Year | Deficiency |
|---|---|---|
| 796–68 | 1963 | $2, 325. 65 |
| | 1964 | 3, 836. 87 |
| | 1965 | 27, 289. 42 |
| 1184–70 | 1966 | 49, 024. 55 |

The parties have reached agreement with regard to all of the deficiencies for petitioner's taxable years 1963 and 1964. Partial agreement has also been reached with regard to the deficiencies for the years 1965 and 1966.

Petitioner has filed an amended petition alleging that the foreign tax credit claimed on its tax returns for each of the years 1963, 1964, 1965, and 1966 was erroneous. This issue is purely a mathematical computation which will be resolved under Rule 50.

The principal issues presented for our consideration are: (1) Whether petitioner transferred "all substantial rights" in its know-how to Osaka thereby effecting a sale of such know-how so as to qualify the proceeds received by petitioner during its taxable years 1965 and 1966 for long-term capital gain treatment, and (2) if a sale of petitioner's know-how to Osaka was effected, whether the allocation of the consideration received from Osaka for the transfer of petitioner's know-how, Japanese patents, and trade name was reasonable.

### FINDINGS OF FACT

Some of the facts herein have been stipulated and are found accordingly.

The Taylor-Winfield Corp. (hereinafter sometimes called petitioner) is an Ohio corporation organized in July of 1927. At the time

of the filing of the petitions in these cases, petitioner's principal place of business was Warren, Ohio. Petitioner's Federal income tax returns for the years ended December 31, 1963, 1964, 1965, and 1966, were prepared on an accrual basis of accounting and were filed with the district director of internal revenue at Cleveland, Ohio.

Prior to and during the tax years in question, petitioner was engaged in the business of manufacturing, designing, and selling equipment for the electrical resistance welding and heating processes, for the induction and dielectric heating and melting processes, and for metal forming and work handling. In connection with its business, petitioner accumulated engineering information, data, microfilm, blueprints, designs, research, development, improvement, and experience for the design and manufacture of its equipment. Such information, data, design, etc., are hereinafter referred to as T–W know-how.

In 1961, petitioner retained the firm of Resources & Facilities, Inc., to find a Japanese company which would be interested in entering into an affiliation with petitioner. Resources & Facilities, Inc., located and recommended to petitioner Osaka Transformer Co., Ltd., hereinafter referred to as Osaka, an unrelated Japanese corporation with its principal place of business at Osaka, Japan.

In the early part of 1964, representatives of the petitioner and of Osaka began negotiations with the intent to obtain sales of petitioner's machines in Japan. Negotiations culminated on May 7, 1965, at which time petitioner and Osaka entered into a "Know-How Agreement." On September 21, 1965, pursuant to the recommendation of the Japanese Government, petitioner and Osaka entered into an agreement entitled, "Supplement to Know-How Agreement" which effected certain changes. (These two documents are collectively referred to hereinafter as the 1965 agreement.) The relevant terms of the agreement are as follows:

WHEREAS T–W has for many years and is presently designing, manufacturing and selling equipment for the electrical resistance welding and heating processes, for the induction and dielectric heating and melting processes, and for metal forming and work handling, and has accumulated, and will continue to accumulate considerable engineering information, data, designs, research, development, improvements, experience, and know-how (all collectively hereinafter referred to as T–W Know-How or simply as Know-How) for the design, manufacture, sale and service of such equipment; and

WHEREAS Osaka desires to acquire such T–W Know-How to facilitate the design, manufacture, sale and service of equipment and designs in the hereinafter described Territory; and

WHEREAS T–W has numerous patents issued and patents pending in Japan related to the aforesaid equipment, and will continue to acquire additional Japanese patents in the future; and

WHEREAS Osaka desires to acquire the right to manufacture the aforesaid equipment under such T–W patents;

Now, THEREFORE, for and in consideration of the premises and of the promises and agreements of each party hereto to the other, by such other to be kept and performed, it is agreed as follows:

## ARTICLE I

1. This Agreement covers equipment and components for the electrical resistance welding and heating processes, for the induction and dielectric heating and melting processes, and for metal forming and work handling, all as designed and manufactured by T–W, provided, however, that nothing shall preclude the modification of this Agreement during its life by mutual consent, to cover equipment for other processes not presently in existence. All of such items as described in this paragraph shall be referred to hereinafter as Equipment or Equipment and Designs.

2. This Agreement includes all Japanese patents related to Equipment which T–W shall now or in the future own or control.

3. In order for Osaka to acquire the T–W Know-How, it is mutually agreed as follows:

Promptly after the effective date of this Agreement, T–W will prepare and forward to Osaka Know-How for Equipment covered by this Agreement consisting of a set of T–W sales manuals complete with catalogues, bulletins, specifications, outline drawings, shipping weights and price lists; a set of the past issues of its regularly published bulletins describing Equipment; a set of photographs of Equipment since 1950 with a matching descriptive chronological index and an index classifying photographs in terms of Equipment functions. T–W will also prepare and forward to Osaka all such Know-How materials coming into existence after the effective date of this Agreement, if any, in units of six months each, during the term of the Agreement.

Upon receiving such Know-How Osaka will select Equipment for which specific design data is needed and advise T–W as to the sequence in which the data is desired. Such data shall consist of engineering bills of material, blueprints of general arrangement drawings, layouts, diagrams, sketches, test reports, and other details as are required by Osaka in the application of the Know-How.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

4. T–W shall not be required by Osaka to undertake new design or experimental work, but only to supply T–W Know-How from T–W's records, knowledge and designs existing at the time of asking. If during the life of this Agreement, Osaka should request from T–W any Know-How regarding equipment and designs covered by the general scope of this Agreement, but consisting of new designs and improvments coming into existence since the effective date of this Agreement T–W shall furnish same to Osaka free of charge.

5. If during the life of this Agreement, Osaka should request from T–W any Know-How not within the scope of this Agreement, T–W may furnish such information, but is not obligated to do so. \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

7. Concurrently herewith Osaka and T–W will execute a "Dealer Agreement" to cover the purchase of Equipment by Osaka from T–W. T–W agrees to supply to Osaka at the dealer's price, accessories, parts and other components which might be required by Osaka in the manufacture of equipment covered by T–W's Know-How during the life of this Agreement.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

## ARTICLE II

1. T–W hereby grants to Osaka the exclusive right to manufacture and sell in Japan, including Okinawa (hereinafter referred to as the Exclusive Territory) Equipment coming under T–W Japanese patents and in accordance with T–W Know-How furnished hereunder.

2. T–W hereby grants to Osaka the non-exclusive right to sell and service Equipment made under T–W patents and/or in accordance with T–W Know-How furnished hereunder, in eastern Asia * * * referred to as the Non-Exclusive Territory * * *

T–W reserves the right, upon six months written notice to Osaka, to amend this Agreement to delete one or more of the countries in the Non-Exclusive Territory.

3. T–W hereby grants to Osaka the right to use the trademarks "T–W" and/or "Taylor-Winfield" and the Taylor Winfield name on Equipment name plates, on company stationery, literature and in advertising matter, provided, however, that the method of usage be submitted to T–W for prior approval.

4. Osaka shall refer to T–W inquiries for Equipment for destination outside the Exclusive or Non-Exclusive Territories.

5. Osaka shall not sub-license others to manufacture or sell Equipment and Designs incorporating T–W Know-How without first obtaining T–W's consent, but shall have the right to procure Equipment or components for its own account, subject, however, to the provisions of paragraph 6 of this Article II.

6. All technical information within the scope of this Agreement mutually exchanged by the parties shall be held as confidential and shall not be communicated to any third party, with the exception of information which is necessary to be given to users of the Equipment for proper operation and maintenance.

## ARTICLE III

1. As consideration for such T–W Know-How, Osaka shall pay and deliver to T–W : —

(a) $100,000 as an initial payment within 20 days after the effective date of this Agreement. * * *

(b) Four per cent (4%) of Osaka's total factory invoiced price of all Equipment manufactured and sold by Osaka of the general types covered by this Agreement, whether manufactured precisely to T–W's designs or not, after deduction of sales taxes, cash discounts, and packing, shipping and insurance charges; but without deduction for sales commissions and/or resale discounts.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

## ARTICLE IV

1. During the life of this Agreement, and at reasonable intervals, each of the parties hereto shall have the right to send authorized personnel to the plants of the other and such visits shall be at the expense of the party sending the personnel.

2. During the first twelve months period following the effective date of this Agreement, Osaka shall have the right to send three of its personnel to T–W for a period of one month for receiving T–W Know-How and observation of T–W methods and applications. Thereafter, Osaka shall have the right to send two of its personnel during each twelve months period to T–W for a period of not more than three weeks each.

3. Should Osaka request T–W to furnish technical assistance in the Territories in connection with T–W Know-How within the scope and life of this Agreement, T–W shall do so at its option, and the actual expense of such assistance shall be borne by Osaka, such actual expense to include the overhead which T–W normally would assign to out-of-pocket expenses and salaries.

## ARTICLE V

\*        \*        \*        \*        \*        \*        \*

2. Subject to the provisions of Article II, Paragraph 3 of this Agreement, Osaka shall, in form approved by T–W, use the trade-marks "T–W" and/or "Taylor-Winfield" and the Taylor-Winfield name on Equipment name plates, on company stationery, literature and in advertising matter.

3. During the life of this Agreement, each party hereto shall regularly furnish to the other all literature, catalogues, and promotional material relative to the Equipment manufactured and sold by it.

## ARTICLE VI

1. During the life of this Agreement, Osaka shall have the right to use and apply T–W Know-How in any manner with any modification deemed necessary to meet the requirements of the Exclusive or Non-Exclusive Territory or the manufacturing standards of Osaka; provided, however, Osaka will assume full and complete responsibility for the use, application, design, manufacture, maintenance of T–W standards of quality of material and workmanship and proper and acceptable functioning of all Equipment in the hands of the User, and will save T–W harmless from any liability therefor, including infringement by T–W's designs claimed of any patents issued in the Exclusive or Non-Exclusive Territories.

\*        \*        \*        \*        \*        \*        \*

3. Osaka acknowledges and shall continue to acknowledge the validity of patents and trademarks heretofore or hereafter granted to or acquired by T–W with respect to Equipment; and shall not file oppositions to the grant of patents to T–W.

4. With prior knowledge and approval of T–W, Osaka shall have the right to apply for and take out patents in the exclusive Territory for any new designs, developments, and improvements which may be furnished to Osaka by T–W within the scope of this Agreement, provided such patents are taken out in the name of T–W and at the expense of Osaka; and Osaka shall have the option to prosecute and/or defend same; however, nothing in this paragraph shall restrict the right of T–W to apply for and take out patents in the Exclusive Territory, at T–W's expense, for any new designs, developments, and improvements of T–W.

5. During the life of this Agreement, Osaka will disclose to T–W all Osaka's developments and improvements related to Equipment coming within the scope of this Agreement.

With respect to patents based on such developments and improvements, Osaka shall have the right to apply for and take out patents in the name of Osaka, at the expense of Osaka, and in all countries of the world. However, with respect to any such patents, T–W shall have a free license during the life of this Agreement. If Osaka shall not desire to file such patent applications in any countries T–W shall thereupon have the right, with respect to such countries,

to file patent applications in the name of T-W and expenses in such countries will be paid by T-W.

With respect to such patents, Osaka will, upon termination of this Agreement, be deemed for all time to have a free license.

ARTICLE VII

*     *     *     *     *     *     *

2. This Agreement shall inure to the benefit of and be binding upon the parties hereto; it shall not be assigned or transferred by either party without the written consent of the other; and shall remain in full force for a period of ten (10) years from its effective date, and the whole of this Agreement or part thereof will be extended for a further period and at rates as agreed upon at such time by the parties, and subject to any necessary approval of any governmental agency of each party, unless one (1) year before its termination, either party gives to the other written notice of its intention to terminate this Agreement.

3. (a) Upon the expiration of this Agreement or any extension thereof, or upon the termination of this Agreement by mutual consent of the parties hereto, Osaka shall immediately discontinue the use of the T-W name and, except as provided in Article VI hereof, the use of any of T-W's patents; provided, however, that Osaka shall have the right for six (6) months after the termination date to complete and deliver any equipment in production pursuant to customer's orders received prior to the date of termination and on which Osaka shall make payments to T-W in accordance with the provisions of Article III, paragraph 1(b).

(b) In the event of default by Osaka, if such default is not cured within sixty (60) days after notice thereof, Osaka shall immediately discontinue the manufacture and sale of equipment according to T-W's Know-How and use of any technical information furnished by T-W under the provisions of this Agreement in addition to the provisions covered by the above Item (a).

4. Notwithstanding the provisions of paragraphs 2 and 3 hereof, this Agreement may be terminated immediately upon notice to that effect, at the option of either party, in the event of the commencement of proceedings in receivership, bankruptcy or insolvency by or against the other party hereto or upon the execution of an assignment for the benefit of creditors or the voluntary dissolution or liquidation of its business by such other party, but such termination shall be without prejudice to the right to assert any claims whatsoever arising under the provisions of this Agreement, including any claim for moneys due or for damages sustained on account of any such receivership, bankruptcy, insolvency, assignment for the benefit of creditors, dissolution or liquidation of such business.

As of May 7, 1965, petitioner owned the following Japanese patents and patent applications relative to its equipment:

Patents issued:

| 419,233 Feb. 4, 1964 | Strip feed for strip joining apparatus (horizontal narrow-lap seam welder with roll-type preloader) |
| 420,312 Feb. 21, 1964 | Flash welding and trimming apparatus (trimmer in exit clamp) |
| 427,387 July 30, 1964 | Limited overlap travel type series seam welder |

Patent applications pending:

| | |
|---|---|
| 34599/61 Oct. 3, 1961_____ | Strip welding apparatus (vertical shear-arc welder) |
| 35491/61 Oct. 10, 1961____ | Flash welding apparatus (trimming at weld line) |
| 37734/61 Oct. 27, 1961____ | Flash welding apparatus (combination flash welder and trimmer) |
| 58379/64 Oct. 15, 1964____ | Method of joining metal and strip (prep-lap seam welder) |

Petitioner applied for registration of its trademark with the Japanese Patent Office in 1965. The trademark was registered in 1967.

During 1965, petitioner received $100,000 from Osaka pursuant to the 1965 agreement, which amount petitioner reported on its income tax return for 1965 as long-term capital gain.

During 1965, the petitioner was involved in negotiations with a Belgium corporation and in connection with these negotiations, around August of 1965, petitioner secured the services of a law firm. Petitioner required the attorneys in the firm to review the agreements it had made with Osaka and three other foreign companies (i.e., F. H. Welding Machines, Ltd., a Canadian corporation; Welding Argentina, S.C.A.; and R. V. Dorman & Co., Pty. Ltd., an Australian corporation). Petitioner's attorneys recommended that the agreements be revised. On January 1, 1966, petitioner entered into an agreement, entitled "Know-How Agreement," with Osaka (hereinafter referred to as the 1966 agreement). The provisions of this agreement are identical to the provisions of the 1965 agreement with the following exceptions:

(a) Article I, paragraph 4, had the following additional clause:

provided T–W shall not be obliged to furnish any such designs and improvements until they have been held by T–W for at least six (6) months.

(b) Article II, paragraphs 1 and 2, were revised as follows:

1. T–W hereby grants to Osaka the exclusive and perpetual right to manufacture and sell in Japan, including Okinawa, (hereinafter referred to as the Exclusive Territory), Equipment in accordance with T–W Know-How furnished hereunder. By such grant, T–W agrees not to manufacture, sell, or service the Equipment in the Territory or to disclose T–W Know-How to anyone else for use in the Territory. By such grant, Osaka shall have the exclusive right to prevent the unauthorized use of the T–W Know-How and the unauthorized use and sale of the Equipment in the Territory.

2. T–W hereby grants to Osaka the exclusive right to use T–W Japanese patents for the term of this Agreement.

(c) In Article I, paragraph 3, the petitioner's right to delete countries in the Non-Exclusive Territories was omitted.

(d) Article III, paragraph 1(b) and paragraph 2 (a) and (b), were revised as follows:

(b) Osaka shall pay to T–W three percent (3%) of Osaka's total factory invoiced price of all Equipment manufactured and sold by Osaka in the Exclusive Territory.

2. As consideration for the rights granted Osaka in paragraphs 2, 3 and 4 of Article II, Osaka shall pay and deliver to T–W:

(a) One percent (1%) of Osaka's total factory invoiced price of all Equipment manufactured and sold by Osaka in the Exclusive Territory; and

(b) Four percent (4%) of Osaka's total factory invoiced price of all Equipment manufactured by Osaka and sold by Osaka in the Non-Exclusive Territory.

(e) Article VII, paragraph 2, was revised to provide that the agreement "shall remain in full force until September 28, 1975."

(f) Article VII, paragraph 3(a), contained the following additional language: "however, Osaka may continue to use and apply T–W Know-How in the Exclusive Territory."

(g) Article VII, paragraphs 7 through 9, were renumbered to provide for a new paragraph 7 as follows:

7. All agreements, contracts, understandings or arrangements of any nature whatsoever, heretofore had between the parties hereto, are hereby wholly abrogated, discharged and annulled, it being the intention of the parties hereto that the provisions hereof constitute and express their entire present Agreement; provided, however, that nothing herein contained shall relieve Osaka from payment of any sum or sums due or unpaid to T–W under any previous Know-How agreement between the parties.

During 1966, petitioner received $18,368 from Osaka pursuant to the January 1, 1966, know-how agreement with Osaka. Of the $18,368, petitioner reported on its income tax return for 1966, $4,592 as ordinary income and $13,776 as long-term capital gain. The entire payment of $18,368 from Osaka was based on sales of equipment manufactured and sold by Osaka in Japan.

The provision in the agreements involved herein with respect to the obligation of Osaka to use the T–W trade mark and trade name was included because of petitioner's insistence upon it.

### ULTIMATE FINDINGS

Petitioner did not transfer all substantial rights to its patents, patent applications, trademarks, trade names, and know-how to Osaka under the 1965 agreement.

Petitioner did not transfer all substantial rights to its know-how to Osaka under the 1966 agreement.

### OPINION

The principal issue to be decided is whether the proceeds received by petitioner in 1965 and 1966 from the Osaka Transformer Co., Ltd.,

a Japanese corporation, under agreements dated May 7, 1965, September 21, 1965, and January 1, 1966, are taxable as ordinary income or as long-term capital gain. Respondent determined that petitioner had entered into a license arrangement with Osaka with respect to its know-how, rather than a sale, since petitioner had retained under the 1965 agreement substantial rights of value and hence, all of the proceeds received by it in 1965 from Osaka for the transfer of know-how are taxable as ordinary income under section 61 of of the 1954 Code.[1] Respondent determined further that with respect to the 1966 agreement with Osaka, the right to terminate the agreement by petitioner is still a substantial right of value in its know-how, and that all of the proceeds received in 1966 are likewise taxable as ordinary income.

In essence, it is respondent's position that the 1965 agreement did not grant Osaka the "perpetual and exclusive" right to manufacture and sell equipment in Japan, including Okinawa, in accordance with petitioner's know-how. Further, it is respondent's position that the 1966 agreement gave Osaka exclusive rights only during the term of the agreement and nonexclusive rights in perpetuity. Petitioner, in opposition, contends that the transfer of its know-how to Osaka under the know-how agreement dated May 7, 1965, constituted a sale of a capital asset held by petitioner for more than 6 months; and that the proceeds received by petitioner from Osaka during 1965 and 1966 in the amounts of $100,000 and $13,776, respectively, were taxable to petitioner as long-term capital gain under section 1221 or 1231 of the Code of 1954. For reasons hereinafter discussed, we agree with respondent.

The taxation of transfers for consideration of technical data, secret processes, and trade secrets is a subject not specifically covered by statute or regulation. It is settled, however, that unpatented technology such as know-how can be the subject of a sale and that technical data is treated for tax purposes in a manner similar to patents. Sec. 1235(a), I.R.C. 1954.[2]

---

[1] All section references are to the Internal Revenue Code of 1954 unless otherwise specified.

[2] SEC. 1235. SALE OR EXCHANGE OF PATENTS.

(a) GENERAL.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

Section 1.1235-2(b)(1), Income Tax Regs.,[3] defines the phrase "all substantial rights" and included in the regulation is an indication of rights which may or may not be substantial depending upon the circumstances of the whole transaction in which rights to a patent are transferred. These include, *inter alia*, retention by the transferor of an absolute right to prohibit sublicensing or subassignment by the transferee. Sec. 1.1235-2(b)(3)(i) Income Tax Regs.[4] In addition, the retention of a right to terminate the transfer at will is the retention of a substantial right for the purposes of section 1235. Sec. 1.1235-2 (b)(4).[5] We believe these subsections of the regulation constitute a reasonable implementation of the statute. Cf. *Donald C. MacDonald*, 55 T.C. 840, 858 (1971); *Vincent B. Rodgers*, 51 T.C. 927 (1969).

The retention of the substantial rights test has also been judicially approved, *Waterman* v. *Mackenzie*, 138 U.S. 252 (1891); and has specifically been applied to cases involving know-how, *Bell Intercontinental Corporation* v. *United States*, 381 F. 2d 1004 (Ct. Cl. 1967); and secret processes, *Pickren* v. *United States*, 378 F. 2d 595 (C.A. 5, 1967); *E. I. DuPont de Nemours & Co.* v. *United States*, 288 F. 2d 904 (Ct. Cl. 1961).

The resolution of the issue before us turns upon the question of whether the provisions in the 1965 know-how agreement relating to the transfer of petitioner's know-how to Osaka constitute a sale or a license. In deciding that a contract was a license, not a sale, for tax purposes, the Court of Appeals in *Pickren* v. *United States, supra*, at 599 said:

The cardinal rule in the interpretation of contracts is to ascertain the mutual intention of the parties and then, so far as it is possible so to do consistently with legal principles, give effect to that intention. * * *

In the same vein, the Court of Appeals stated that in determining such intention, the court should consider the language of the document in

[3] Sec. 1.1235-2(b). *All substantial rights to a patent.* (1) The term "all substantial rights to a patent" means all rights * * * which are of value at the time the rights to the patent (or an undivided interest therein) are transferred. * * *

&ast; &ast; &ast; &ast; &ast; &ast; &ast;
The circumstances of the whole transaction, rather than the particular terminology used in the instrument of transfer, shall be considered in determining whether or not all substantial rights to a patent are transferred in a transaction.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;
A transfer limited in duration by the terms of the instrument to a period less than the remaining life of the patent is not a transfer of an undivided interest in all substantial rights to a patent.

[4] Sec. 1.1235-2(b)(3). Examples of rights which may or may not be substantial, depending upon the circumstances of the whole transaction in which rights to a patent are transferred, are:

(i) The retention by the transferor of an absolute right to prohibit sublicensing or subassignment by the transferee;

[5] Sec. 1.1235-2(b)(4). The retention of a right to terminate the transfer at will is the retention of a substantial right for the purposes of section 1235.

its entirety; and in deciding whether the instrument only gives a li-cense to use an invention or secret formula, or transfers all substantial rights therein, the terminology used may be of great significance. *E. W. Bliss Co.* v. *United States*, 253 U.S. 187, 192 (1920). The label or name borne by the instrument of transfer is not determinative; nor is the form thereof necessarily conclusive. *Cleveland Graphite Bronze Co.*, 10 T.C. 974, 988 (1948), affd. 177 F. 2d 200 (C.A. 6, 1949).

Pursuant to these principles, we must look to the documents involved herein and the total factual complex to acertain whether peti-tioner and Osaka intended to enter into a sale or a license of the know-how in question. In our judgment the evidence is clear that petitioner retained the right to terminate the 1965 know-how agreement at will at the end of the 10-year period. Article VII, paragraph 2, of the agree-ment provides:

This Agreement * * * *shall remain in full force for a period of ten (10) years* from its effective date, and the whole of this Agreement or part thereof will be extended for a further period and *at rates as agreed upon at such time* by the parties, and subject to any necessary approval of any governmental agency of each party, *unless one (1) year before its termination, either party gives to the other written notice of its intention to terminate this Agreement.* [Emphasis added.]

In addition, Article VII, paragraph 3(a), provides that upon expira-tion of this agreement, Osaka shall immediately discontinue the use of any T–W patents. Significantly, it is the right to manufacture and sell equipment coming under T–W patents and in accordance with the know-how furnished which is the grant, the taxation of which is to be resolved.

In *Bell Intercontinental Corporation*, a contract which transferred production know-how, including engineering and manufacturing data, provided, among other things, that either party to the contract had the right to terminate the agreement at any time after 10 years with or without cause upon 60 days' notice. The court held that the presence of this termination provision prevented a sale of know-how because all substantial rights of value were not transferred. The court also stated in *Bell Intercontinental Corporation:*

a transfer limited in duration to a period less than the remaining life of the patent, or a transfer—as here—terminable by the grantor not on the happening of a future event beyond his control but at his own discretion prior to the pat-ent's expiration date will ordinarily constitute a licensing arrangement rather than a sale inasmuch as the transfer does not convey to the transferee all sub-stantial rights in the patent. This is to say that when such power of of cancella-tion exists, the conclusion is usually unavoidable that the grantor retained a substantial interest in the rights which he transferred. * * *

More recently, in *PPG Industries, Inc.*, 55 T.C. 928 (1970), the tax-payer's payments received from PPG Industries, a wholly owned sub-

sidiary, for the transfer of unpatented technology were held to be ordinary income when we stated:

> We conclude that the transfer of unpatented technology under each of the four agreements was for a fixed period of years and that such transfers did not convey all substantial rights in the subject matter covered by the agreement. See *Pickren* v. *United States*, supra. * * * We hold that the transfers of rights in the unpatented technology for a limited period did not constitute sales of such property and, consequently, the payments received by petitioner under such agreements do not qualify for capital gains treatment under the statute.

To the same effect, see *Lynne Gregg*, 18 T.C. 291, 302 (1952), affirmed per curiam 203 F. 2d 954 (C.A. 3, 1953); and *Thomas D. Armour*, 22 T.C. 181, 188–189 (1954); sec. 1.1235–2(b), Income Tax Regs.

We reject petitioner's argument that the 10-year period mentioned in Article VII, paragraph 2, of the 1965 know-how agreement referred only to certain inconsequential rights and not to the entire bundle of property rights transferred to Osaka. Petitioner acknowledges that Article VII, paragraph 2, states that the agreement is terminable by either party after a 10-year period. However, petitioner avers that the 1965 know-how agreement involved a transfer of 11 separate substantive rights [6] in addition to the T–W know-how in existence as of May 7, 1965, which was granted to Osaka and that petitioner retained the right of termination only as to these 11 rights, and not the T–W know-how actually transferred to Osaka under the agreement. Essentially, petitioner maintains that "Osaka's right to manufacture and sell in accordance with the T–W know-how transferred during the 10-year period remains unimpaired thereafter even though the parties may ultimately terminate the Agreement in 1975 in all other respects." Petitioner urges that the parties to the 1965 agreement intended Osaka's rights to be perpetual, and that the 1966 agreement simply confirmed what the parties had initially intended under the 1965 know-how agreement, namely, that Osaka had been granted both the "exclusive and perpetual" right to manufacture and sell equipment in the exclusive territory. In short, petitioner argues that the 1966 agreement was simply a clarification of the intent of the parties

---

[6] Petitioner contends that in addition to the basic transfer of T–W know-how, the 1965 know-how agreement granted Osaka, *inter alia*, the exclusive right to manufacture and sell under T–W patents in Japan, equipment coming under T–W Japanese patents and in accordance with T–W know-how furnished under the agreement (Art. II, par. 1; Art. VII, par. 3); the right to use the T–W trademark and trade name (Art. II, par. 3); the nonexclusive right to sell and service under T–W patents and/or T–W know-how in eastern Asia, referred to as the nonexclusive territory (Art. II, par. 2; Art. VII, pars. 2 and 3); the right to send authorized personnel to petitioner's plant (Art. IV, par. 1); the right to obtain a patent on improvements (Art. VI, par. 5); and the right at dealers' prices to purchase accessories, parts, and other components which might be required by Osaka in the manufacture of equipment covered by T–W's know-how during the life of this agreement (Art. I, par. 7).

and made no substantive changes in the basic understanding previously reached.

We are not convinced by petitioner's interpretation of the agreement. We are mindful that although paragraph 3(a) of Article VII describes some of those rights granted to Osaka which cease upon termination of the know-how agreement (unless extended by mutual agreement of the parties), this paragraph does not specifically provide for the discontinuance of the use of the T–W know-how previously transferred. However, we do not believe that this means that Osaka's rights as to the T–W know-how are to continue unimpaired after termination, as petitioner urges. The fact that under the agreements none of the know-how was to revert to petitioner is not determinative or meaningful since it merely stated the obvious fact that when the grant of the unpatented technology is terminated (after a period of 10 years from the effective date of the agreement), Osaka cannot eradicate the knowledge gained by it under such grant. It is difficult to see how it could be otherwise. *PPG Industries, Inc., supra* at 1014.

We do not agree with petitioner's argument that its patents and patent applications in the United States and Japan are incidental to the T–W know-how relating to such patents; that the aggregate value of all of its patents in the United States is not significant; and that the T–W know-how involved represented the "lion's share of the value transferred" to Osaka. As we construe the contracts here in question, the 11 substantive rights relating to T–W patents, referred to by petitioner, all of which have limited duration, are actually valuable rights (standing alone or in combination) transferred to Osaka for a substantial part of the total consideration set forth in the 1965 agreement. Petitioner, who has the burden of proof, has failed to substantiate its contention that the property rights which were to revert to it upon termination of the agreements involved were of no practical or material value. *PPG Industries, Inc., supra* at 1015, fn. 23; *Young* v. *Commissioner*, 269 F. 2d 89, 93 (C.A. 2, 1959), affirming 29 T.C. 850 (1958). See *Heil Co.*, 38 T.C. 989, 1001–1002 (1962), and *Bell Intercontinental Corporation* v. *United States, supra* at 1021.

We believe that the 1965 agreement (Article VII, paragraph 2) specifically permits petitioner to terminate the agreement at the end of 10 years and the retention of this right constitutes a substantial right of ownership which negatives a sale. With respect to the 1966 agreement, the provisions of this agreement are identical to the provisions of the 1965 agreement with several exceptions set forth in extenso in our Findings of Act. Although the 1966 agreement attempted to grant Osaka both the exclusive and perpetual rights in the "exclu-

sive territory," the 1966 agreement retains substantially the same termination provisions as the 1965 agreement. Thus pursuant to Article VII, paragraph 2, the 1966 agreement will terminate on September 28, 1975, but will be extended for a further period and at rates as agreed upon at such times by the parties unless either party gives notice to terminate. Unquestionably the right to terminate the 1966 agreement by petitioner is the retention of a substantial right of value which, as in the case of the 1965 agreement, bars the transaction from qualifying as a sale.

We also note that Article VI, paragraph 1, of the 1966 agreement specifically provides that "during the life of this Agreement," Osaka shall have the right to use and apply T–W know-how. This provision, in our view, is inconsistent with the granting of a perpetual right to use the know-how beyond the term of the agreement. Moreover, paragraph 3(a) of Article VII was changed to permit Osaka to continue to use and apply T–W know-how in the "exclusive territory" after the termination of this agreement. If the rights granted to Osaka in the 1966 agreement were perpetual and exclusive as petitioner avers, there would be no need to give Osaka permission to use the unpatented technology after termination. These two provisions (Article VI, paragraph 1, and Article VII, paragraph 3(a)) clearly show that the exclusive nature of the grant in Article II, paragraph 1, only extends up to the termination of the agreement. After termination, while Osaka may use the know-how, it no longer possessed the exclusive right to do so and petitioner thereafter is free to use the same know-how or relicense its use in the "exclusive territory." Considering the 1966 agreement in its entirety and all of the underlying circumstances of the transaction, we are convinced that it must be treated in the same manner as the 1965 agreement as a mere licensing arrangement.

Our examination of the documents under review shows a studied effort on the part of petitioner to retain control over its patents, patent applications, trademarks, trade names, and know-how mentioned in the agreements. Significantly, in Article II, paragraph 5, of the 1965 agreement, we note that Osaka could not disclose any of the technical data obtained from petitioner without first securing the latter's consent. Such a proscription has been considered a substantial right. In this connection see *Commercial Solvents Corporation*, 42 T.C. 455, 469 (1964), where the taxpayer received income from a Japanese corporation, Kyowa, under a contract for the use of the taxpayer's processes and know-how relating to the production of certain chemical compounds in the territory of Japan. Under the contract, Kyowa was not allowed to make any disclosure of the secret process to anyone without prior permission in writing from the taxpayer. In holding

that the retention of such control was not indicative of a sale of the process to Kyowa, we quoted with approval the following language from *E. I. duPont de Nemours & Co.*:

It follows that the essential element of a trade secret which permits of ownership and which distinguishes it from other forms of ideas is the right in the discoverer to prevent unauthorized disclosure of the secret. No disposition of a trade secret is complete without some transfer of this right to prevent unauthorized disclosure.

We recognize that in the 1966 agreement, Article II, paragraphs 1 and 2, were revised so that Osaka was to have the exclusive right to prevent the unauthorized use of the T-W know-how and the unauthorized use and sale of the equipment in Japan. However, since the element of control over unauthorized disclosure was not transferred to Osaka in the 1965 agreement, we must hold that this retention of a substantial right of value negatives a sale under this agreement.

Petitioner's reliance on *United States Mineral Products Co.*, 52 T.C. 177 (1969), is misplaced. There the Canadian taxpayer granted its subsidiary the "exclusive right" within the territorial limits of Canada to use and to grant to others the right to use taxpayer's formulae and designs. Holding that the transaction constituted a sale, we said that the taxpayer had conveyed its most important property right to its subsidiary, viz, the right to prevent unauthorized disclosure. Here, unlike *United States Mineral Products Co.*, under Article II, paragraph 5, of the 1965 agreement, Osaka specifically was not permitted to sublicense to others to manufacture or sell equipment and designs incorporating T-W know-how without first obtaining T-W's consent; and all technical information within the scope of the 1965 agreement mutually exchanged by the parties must be held as confidential and "shall not be communicated to any third party."

We have given due consideration to the terms employed in the granting clauses of the documents and we believe that the actual language used by the parties is compatible with our interpretation of the agreements in their entirety as terminable grants of unpatented technology. It is noteworthy that the 1965 agreement used the phrase "during the term of this Agreement" or "upon termination of this Agreement" at least 14 times, indicating to us an intent inconsistent with that of a permanent sale. Moreover, the fact that the original agreement was revised is indicative of a continuing business relationship subject to adjustment, which is more like a license than a permanent sale. *Edward W. Reid*, 50 T.C. 33 (1968).

We have reviewed the deposition of Dr. Hasegawa taken through interrogatories and find that we are unable to give his testimony sufficient weight to alter our construction of the agreements in question.

The questions posed to him called for interpretation of the contracts and his answers were conclusory, interpretative, and contrary to the clear language of the agreements. The interpretation of the parties to an ambiguous contract, while admissible as evidence, is to be gleaned primarily from their actions in carrying out its terms and their oral opinions as to its meaning bear little weight. The parties to this action both contend that the agreements in controversy are unambiguous and both stand on its wording. We find the agreements are unambiguous only when construed in accordance with respondent's determination.

Viewing the record as a whole, and particularly the factors discussed above, we hold that petitioner and Osaka intended to enter into a license agreement and did so, and accordingly, the amounts received by petitioner from Osaka during the taxable years 1965 and 1966 constituted ordinary income under section 61, *supra*. In view of our disposition of the first issue, it is not necessary to discuss the second issue raised by the pleadings.

*Decisions will be entered under Rule 50.*