WATER RESOURCE CONTROL, JOHN H. WHITEHOUSE, Trustee, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOHN H. WHITEHOUSE AND CAROL A. WHITEHOUSE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Water Resource Control v. Commissioner
Docket Nos. 18689-83, 18690-83
United States Tax Court
T.C. Memo 1991-104; 1991 Tax Ct. Memo LEXIS 123; 61 T.C.M. (CCH) 2102; T.C.M. (RIA) 91104; March 6, 1991, Filed *123 Decision will be entered under Rule 155 in docket No. 18690-83. Decision will be entered for petitioner in docket No. 18689-83. Petitioner husband (H) invented a patentable water-economical toilet (the "Meditator"). H, along with a promoter, (J), created a trust (T), exchanging rights in the Meditator for certificates of beneficial interest in T. H ended as sole trustee, and petitioner wife (W) became the sole certificate holder. T's stated primary purpose was to manufacture the Meditator. A third party, the Meditator Company of California, run by J, bought the U.S. rights to the Meditator and marketed Meditator distributorships and paid a percentage of the proceeds to T. T used these funds for H and W's personal expenses, and for making securities investments through another entity, whose bank account was controlled by H and W. Held: (1) T is not an association taxable as a corporation, because it does not have associates. Sec. 7701(a)(3), I.R.C. 1954; sec. 301.7701-2(a)(2), Proced. & Admin. Regs. (2) T is subject to the grantor trust rules of sections 671 through 677, I.R.C. 1954. Thus, all its income and expenses are directly attributed to the grantor, H. T transferred *124 $ 265,000 to a bank account ostensibly owned by an entity of another individual, but in fact controlled by H and W. That bank account promptly transferred $ 260,000 back to T. Held: (3) The transfers were merely circular movements of funds, and not a payment of a royalty followed by a loan; deduction disallowed. Other deductions disallowed in whole or in large part because of T's failure to show the expenditures were made, or that the expenditures were business-related. (4) T's proceeds from the sale of the U.S. rights to the Meditator are taxable as capital gains. Sec. 1235, I.R.C. 1954. (5) H and W are subject to additions to tax for negligence under section 6653(a), I.R.C. 1954. Joe Alfred Izen, Jr., for the petitioners. Robert J. Percy and Stephen C. Best, for the respondent. CHABOT, Judge. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in Federal trust income tax and additions to tax under section 6653(a)[1] (negligence, etc.) against petitioner Water Resource Control, in docket No. 18689-83, as follows: Additions to Tax
Year
Deficiency Sec. 6653(a)
1979
$ 201,548.60
$ 10,077.43
1980
19,616.37
980.82
*125 Respondent also determined deficiencies in Federal individual income tax and additions to tax under section 6653(a) against petitioners John H. Whitehouse and Carol A. Whitehouse, in docket No. 18690-83, as follows: Additions to Tax
Year
Deficiency Sec. 6653(a)
1979
[2] $ 184,341.30
$ 9,217.07
1980
13,006.16
650.31
These cases have been consolidated for trial, briefs, and opinion. After concessions by the parties [3], the issues for decision are as follows: (1) Whether the income *126 and expenses of petitioner Water Resource Control are taxable to the individual petitioners. (2) Whether petitioners have substantiated certain claimed deductions and credits. (3) Whether petitioners are entitled to capital gain treatment on the sale of certain rights to an invention. (4) Whether petitioners are subject to additions to tax for negligence under section 6653(a).
*127 FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. When the petitions were filed in the instant cases, John and Carol, husband and wife, resided in West Suffield, Connecticut; WRC had its legal residence and principal office in West Suffield, Connecticut. John has been self-employed in the business of inventing, designing, and manufacturing new products during his whole adult life. John ran a business, called Whitehouse Engineering, as a sole proprietorship. John's and Carol's residence included a 9,000-square-foot barn, which was used for research and development. Carol assisted John in the development of some of his inventions, and kept the books for Whitehouse Engineering. John and Carol reported their income and deductions on the basis of cash receipts and disbursements. John has no formal degree or license; however, he was educated in aeronautical engineering at Pratt Institute, and also attended Northeastern University and the Massachusetts Institute of Technology. John designed and completed the prototype of a device called the Meditator toilet in or about 1971. Before this *128 time, John had invented other toilets and had improved on his inventions over the years. The Meditator toilet is a water-economical toilet. Other than prototypes and test models, no Meditator toilets were ever built. John first met Paul S. Dane (hereinafter sometimes referred to as "Dane") in New York in 1939. (See our comments regarding Dane in n.19, infra.) Dane had an interest in the design of marine toilets. Dane was president of International Business Services, Ltd. [4] (hereinafter sometimes referred to as "IBS"), with a place of business in Nassau, Bahamas. Events of October 27-28, 1978
On the weekend beginning Friday, October 27, 1978, John met with James S. Jenkins (hereinafter sometimes referred to as "Jenkins") from California. Jenkins was president of the Meditator Company. Jenkins proposed to sell Meditator toilet distributorships *129 throughout the United States. Jenkins brought his lawyer, Richard Ellner (hereinafter sometimes referred to as "Ellner") to the meeting with John. Ellner advised as to the securities law consequences of selling the distributorships. On Saturday, October 28, 1978, John and Jenkins created WRC. John consulted his own attorney, F. Michael Joseph, who, in his capacity as notary, witnessed the signing of the WRC Contract and Declaration of Trust (hereinafter sometimes referred to as "the Trust Instrument") on October 28, 1978. The duration of WRC was 10 years, unless sooner terminated or renewed at the sole discretion of the trustees. The Trust Instrument states that its purpose is to form WRC as a Pure Common Law Trust Organization. The preamble states as follows: PREAMBLE
This Contract and Declaration of Trust (the "Indenture") is made this 28th day of October, 1978, by and between James S. Jenkins, of Woodland Hills, California, as Creator of this Common Law Trust Organization, and the below named Investor/Exchangor. The Creator has offered, and hereby offers to bargain, or exchange, in trade, the sum of One Dollar ($ 1.00) and all authorized Trust Certificate Units, *130 for certain real and/or personal property of John H. Whitehouse of West Suffield, Connecticut, as investor/exchangor, who, for the said sum and all One Hundred (100) Trust Certificate Units, the receipt and sufficiency of all of which is hereby acknowledged (which said investor considers to be full and adequate consideration for such exchange), accepts such offer and do [sic] hereby bargain, assign, convey, exchange, and deliver all that certain real and/or personal property of the investor/exchangor unto said Creator, who now temporarily takes and holds title thereto in the Trust Organization name, WATER RESOURCE CONTROL, pursuant to the terms hereof. The purport of this instrument is that these same assets, and all interest therein, will be promptly assigned and conveyed to a Board of Trustees, so as to constitute the corpus of this Pure Common Law Trust Organization (frequently called "Trust Organization"), hereby created and to begin forthwith, for the benefit of its certificate holders, with such assets to be held in fee simple by the trust, organization [sic] (or by its trustees, if otherwise required), in trust, for the period(s) hereof. Its purposes are to provide for the *131 growth and preservation of the corpus, and the safe, logical and economical administration thereof by natural and/or artificial persons or entities acting in a fiduciary capacity.
The Trust Instrument states as follows: CHARACTER OF THE TRUST ORGANIZATION
It is hereby expressly declared that there is created a pure, common law form of trust, of the type commonly termed a business trust, and not a partnership, corporation or joint-stock association. [5]
This trust is hereby created as a separate, legal entity. None of the Certificate Holders as such shall ever have or possess any legal or equitable title in any of the properties or assets of this Trust *132 Organization. Full title (both legal and equitable) to all its assets and properties is merged in the Board of Trustees. Title to assets shall be held, and properties conveyed, as herein provided. Certificate Holders as such have absolutely no rights in the management of this Trust Organization, nor in the selection or replacement of its Trustees, nor control over them.
The Trust Instrument declares that Jenkins shall appoint the first trustee of WRC, after which the first trustee may independently appoint a second trustee, and they in turn may appoint a third trustee. The Trust Instrument provides that the trustees may, in the name of WRC, conduct any and all business, deal with any property, and sue or be sued, and that WRC's principal place of business shall be in West Suffield, Connecticut, or elsewhere as designated by the trustees. The Trust Instrument provides as follows: CHARACTER, ISSUANCE, TRANSFER AND OWNERSHIP OF CERTIFICATES
This Trust Organization is authorized to issue One Hundred (100) Trust Units, each of equal value, to be evidenced by exchange to such persons, for such sums or other consideration, and on such terms, as they may deem expedient. Trustees *133 shall issue or cause to be issued to such investors, certificates in such form as the trustees may deem proper, evidencing the beneficial interests of such share owners. The certificates shall be personal property and shall entitle the owners thereof to participate in all surplus and other distributions of net income as the Trustees from time to time may declare and pay out. This is an option, and not a duty. The Holders of record of Trust Certificates shall be entitled only to their proportionate shares of any such distributions, and of the assets upon dissolution as provided herein. The only relationships of the Certificate Holders to the Trustees and to this Trust Organization, are those described herein and none other. There are to be no meetings of the Certificate Holders as such. Except as provided in this declaration of trust, no holder of a certificate evidencing ownership of an interest in the trust shall have any authority, power or right whatsoever to transact any business for or on behalf of the trust, or the Trustees hereof, in connection with the trust property, or any part thereof, and shall have no interest in the specific property belonging to the trust, or *134 in any part thereof, except the rights to receive the income and distributable funds arising therefrom as set forth herein. The rights of Certificate Holders and of transferees and other persons becoming entitled to shares of the trust shall be subject to all the terms and conditions of this declaration of trust. No Certificate Holder shall have any right to a partition of the trust property or to an accounting during the continuance of the trust. With the prior approval of the Board of Trustees, Trust Units (and the Certificates representing the same) shall be transferable before the death or dissolution of the registered Holder thereof, by a simple assignment in writing, accompanied by surrender of such Certificate(s) to the Trustees or their agent, but no transfer shall be effective against the Trustees (even with actual or constructive notice), unless and until approved by them and a record of the new Certificate has been duly noted in the Minutes of the Trust Organization. On the transfer, surrender, or release thereof from the registered Holder, a new Certificate shall be issued to the designated transferee(s). In case of a transfer of only part of the total Units held, *135 a new Certificate for the residue shall be issued to the transferor. In case of loss or destruction of a Certificate of shares, a new one may be issued in its place, on such conditions as the Trustees may deem necessary and proper.
The Trust Instrument provides as follows: POWERS AND DUTIES OF TRUSTEES AND OFFICERS
The original Trustee and the Board thereof, for themselves and their successors, hereby accept the assignment and conveyance, in trust, upon the terms and conditions of this Indenture, and receipt for the delivery of all the assets and properties listed in Schedules A and B hereto, [6] together with related supporting documents. They agree to conserve, build and improve upon the assets of the Trust Organization in such manner as may increase its value and financial rating, exercising their best judgment and discretion, and in all other respects to administer their duties in good faith and in conformity with the provisions hereof. All funds received or paid into the treasury are, and shall become, part of the corpus of the Trust Organization.
*136 Trustees shall hold the legal title to all property at any time belonging to the Trust, and shall have absolute and exclusive control, management and disposition thereof, and absolute and exclusive power and control over the management and conduct of the businesses and affairs of the trust, free from any power of control on the part of the Certificate Holders. Trustees may hold, manage, deal with and dispose [sic] of the property and business of the trust in the same manner as if they were the absolute proprietors thereof, subject only to the specific limitations herein placed on their powers. The enumeration of powers contained herein shall not be construed as limiting in any way the general powers hereby conferred on Trustees. They shall have all powers necessary, convenient, or appropriate to the purposes and ends of this trust, and are authorized to take any action which they may deem proper to carry out such purposes. Trustees shall have the powers, among others, to purchase or otherwise acquire property, patents, inventions, and to sell, exchange, lease, mortgage, pledge, or in any manner dispose, encumber, improve, or deal with the property of the trust, or any part *137 thereof or any interest therein, on such terms and for such consideration and purposes as they deem proper. Trustees may engage in business, manufacture and deal in goods, wages and merchandise, incur indebtedness, borrow or loan money with or without security, enter into contracts of all kinds, execute, accept, discount, negotiate and deal in commercial paper and evidences of indebtedness, execute conveyances, mortgages, deeds of trust, leases and any other instrument in writing; they may invest and reinvest the trust funds; they may compromise or settle any suits, claims, or demands, or waive or release any rights, relating to the trust property or business; they may appoint and employ officers, agents, attorneys and servants. Trustees may sue and be sued and prosecute and defend any and all actions affecting the trust or its business or property, either in the name of the trust or in their own names; they may adopt and enforce such rules and regulations not inconsistent with the provisions of this instrument, as they may from time to time deem expedient.
Under the Trust Instrument, the trustees may set their own compensation, amend the Trust Instrument, and lengthen or shorten *138 the term of the trust, without obtaining anyone else's concurrence, as follows: COMPENSATION OF TRUSTEES
Trustees shall receive such compensation, regular or special, as they shall deem reasonable and proper. They shall fix the compensation, if any, of all officers and agents appointed by them.
* * * AMENDMENTS
This declaration of trust may be amended in any particular, except as regards the liability of the Certificate Holders, by the Trustees, by an instrument in writing, signed by the Trustees and setting out the amendment.
DURATION, TERMINATION AND CONTINUATION
This Trust Organization shall continue for a period of ten (10) years from date, unless sooner terminated. The Trustees may, in their unanimous discretion, because of a change in conditions, threatened depreciation in values, or for any other reason only to them deemed good and sufficient, liquidate and/or distribute the remaining assets as provided below, and close the Trust Organization at an earlier date fixed by them. A Resolution of early termination shall be placed in the Minutes. At any time before the above provided expiration date, the then Trustees, if they so desire and believe *139 that said Trust Organization should be continued, may renew, and likewise before the expiration of any renewal period, may further renew, this Contract and Declaration of Trust for a like or shorter time period. A Resolution of such renewal or further renewal shall be entered into the Minutes.
The first meeting of WRC was held on the day it was created. WRC gave $ 1 and the 100 certificates of beneficial interest to John and Carol; John gave the Meditator toilet to WRC in return. John and Carol each received 50 certificates of beneficial interest. John immediately assigned his certificates to Carol in exchange for $ 1. Carol remained the only holder of the certificates of beneficial interest throughout the years in issue. Jenkins also appointed John as the first trustee of WRC, and John accepted that appointment. Also on October 27, 1978, a contract entitled Agreement to Manufacture (hereinafter sometimes referred to as "the Manufacturing Agreement") was signed by John as trustee of WRC and by Jenkins as president of the Meditator Company. The Manufacturing Agreement provided that WRC would manufacture the Meditator toilet. Another contract entitled Invention and Patent *140 Purchase Agreement (hereinafter sometimes referred to as "the Distribution Agreement") was signed on October 28, 1978. The Distribution Agreement was signed by John as trustee of WRC and by Jenkins as president of the Meditator Company, and assigned all United States rights in the Meditator toilet to the Meditator Company. The Meditator Company, which had already paid $ 10,000 to WRC, agreed to pay an additional $ 90,000 to WRC on the signing of the Distribution Agreement. The Distribution Agreement called for WRC to receive 20 percent of the proceeds from the Meditator Company's distributorship sales. WRC reported on its 1979 tax return that it received $ 293,805 from the Meditator Company as a result of this agreement. Subsequent Transactions
On February 1, 1979, John filed a patent application for the Meditator toilet with the United States Department of Commerce, Patent and Trademark Office. The Patent and Trademark Office determined (in August 1980) that a patent was allowable, but considered the patent application abandoned when John failed to pay the necessary fee on time. As a result, no patent was issued on the Meditator toilet. John made all of the business *141 decisions for WRC. Carol kept the books for WRC, as well as for Whitehouse Engineering. WRC's income and expenses were reported on the basis of cash receipts and disbursements. Petitioners filed tax returns for WRC for 1979 and 1980, using Form 1041 (U.S. Fiduciary Income Tax Return) for both years. John opened a bank account (hereinafter sometimes referred to as "the WRC Bank Account") under WRC's name on or about October 31, 1978. Tables 1 and 2 show deposits and withdrawals, respectively, from the WRC Bank Account for the period March 14, 1979, through April 30, 1986. Table 1 Deposits Into WRC Bank Account
Date
Amount
Payor
10/12/79
$ 164,054.62    A.G. Edwards & Sons, Inc.
10/19/79
33,625.00    A.G. Edwards & Sons, Inc.
10/19/79
28,437.63    A.G. Edwards & Sons, Inc.
11/02/79
100,000.00    IBS (signed by Dane)
11/06/79
160,000.00    IBS (signed by Dane)
11/19/79
196,887.02    (damaged film) *
03/03/80
2,000.00    A.G. Edwards & Sons, Inc.
04/03/80
3,000.00    (damaged film)
04/08/80
3,000.00    (credit memo)
05/09/80
2,000.00    A.G. Edwards & Sons, Inc.
05/19/80
1,000.00    A.G. Edwards & Sons, Inc.
06/04/80
2,000.00    A.G. Edwards & Sons, Inc.
06/05/80
25.00    Third National Bank
06/05/80
140.00    Taylor Rental Corp. (dividend)
06/05/80
1,000.00    A.G. Edwards & Sons, Inc.
06/26/80
1,000.00    A.G. Edwards & Sons, Inc.
08/13/80
3,000.00    A.G. Edwards & Sons, Inc.
11/04/80
100.00    NA **
11/04/80
140.00    Taylor Rental Corp. (dividend)
12/31/80
140.00    Taylor Rental Corp. (dividend)
01/06/81
5,000.00    A.G. Edwards & Sons, Inc.
01/19/81
20,000.00    IBS (signed by Dane)
04/21/81
100.00    NA
07/07/81
10,000.00    A.G. Edwards & Sons, Inc.
01/14/82
25.00    NA
05/27/82
1,000.00    IBS (signed by Dane)
11/18/82
5,918.24    A.G. Edwards & Sons, Inc.
11/18/82
15,254.76    A.G. Edwards & Sons, Inc.
*142 Table 2 Checks Drawn on WRC Bank Account
Date Paid Amount
Payee
03/14/79
$ 4,000.00   NA (see ** in table 1)
10/29/79 1,000.00   cash (endorsed by Carol)
10/29/79
213,000.00   IBS
10/29/79
10,000.00   Elaine J. Wold (cert. check)
11/05/79
33,875.00   A.G. Edwards & Sons, Inc.
11/05/79
65,000.00   A.G. Edwards & Sons, Inc.
11/08/79
2,000.00   Whitehouse Engineering
11/08/79
160,000.00   A.G. Edwards & Sons, Inc.
11/20/79
100.00   S.E. Hahn
11/21/79
1,000.00   cash (endorsed by John & Carol)
11/23/79
193,000.00   IBS
11/28/79
4,000.00   Whitehouse Engineering
03/07/80
2,000.00   Whitehouse Engineering
04/15/80
3,000.00   (damaged film) (see *, table 1)
05/14/80
2,494.00   Internal Revenue Service
05/15/80
2,000.00   Whitehouse Engineering
06/06/80
1,500.00   Whitehouse Engineering
06/10/80
2,000.00   Whitehouse Engineering
06/26/80
250.00   cash (endorsed by John)
07/02/80
2,000.00   (damaged film)
08/27/80
3,000.00   Whitehouse Engineering
11/13/80
110.00   NA
11/26/80
24.75   NA
01/02/80
24.75   The Hartford Club
01/21/81
24,650.00   (damaged film)
01/22/81
182.90   The Hartford Club
02/24/81
119.22   NA
04/01/81
25.00   NA
04/02/81
42.33   NA
04/23/81
228.00   NA
04/29/81
58.72   NA
05/28/81
24.75   NA
07/09/81
9,800.00   Fechtor, Detwiler & Co., Inc.
07/13/81
41.44   NA
08/05/81
24.75   NA
09/02/81
27.50   NA
10/23/81
90.00   NA
01/22/82
27.50   NA
06/08/82
1,000.00   Whitehouse Engineering
11/29/82
6,000.00   A.G. Edwards & Sons, Inc.
12/16/82
1,952.50   Menard Oil Company
12/23/82
4,000.00   cash
01/20/83
8,900.00   Fechtor, Detwiler & Co., Inc.
*143 Service charges and similar charges were imposed on the WRC Bank Account during the years and in the amounts shown in table 3. Table 3
Year
Amount
1979
$ 3.48
1980
7.53
1981
18.42
1982
35.77
1983
14.84
Royalty Expense
Carol opened a bank account in the name of IBS (hereinafter sometimes referred to as "the IBS Bank Account") with a $ 200 initial deposit. The IBS Bank Account was in the same branch of the bank in which the WRC Bank Account was held. Carol and Dane were the signatories on the IBS Bank Account. The address on the IBS Bank Account was that of John and Carol. Tables 4 and 5 show deposits into and checks drawn on the IBS Bank Account for the period October 29, 1979, through November 7, 1983. Table 4
Deposits Into IBS Bank Account
Date
Amount    Payor
10/29/79
$ 52,000.00   WRC
10/29/79
213,000.00   WRC
11/23/79
193,000.00   WRC
04/01/80
6,462.50   daily cash accumulation fund *
10/08/80
43,000.00   (damaged film) (see *, table 1)
10/08/80
57,000.00   (damaged film) (see *, table 1)
12/31/80
6,462.50   daily cash accumulation fund
12/31/80
6,462.50   daily cash accumulation fund
01/14/82
475.31   NA (see **, table 1)
*144 Table 5
Checks Drawn on IBS Bank Account
Date Paid
Amount   Payee
11/02/79
$ 100,000.00   WRC
11/06/79
160,000.00   WRC
12/10/79
25,000.00   Midas Management Assoc., Ltd.
(signed by Carol)
12/14/79
172,000.00   WRC
11/07/80
47,000.00   Midas Management Assoc., Ltd.
11/07/80
53,000.00   Midas Management Assoc., Ltd.
01/19/81
20,000.00   WRC
05/27/82
1,000.00   NA
After the $ 1,000 check was paid out of the IBS Bank Account, on May 27, 1982, the balance in the account was $ 54.26. The only transactions in the IBS Bank Account thereafter were $ 4 monthly activity charges, until the balance was completely eliminated. On the same day that Carol opened the IBS Bank Account with a $ 200 deposit, WRC made two checks payable to IBS, one for $ 213,000, and the other for $ 52,000, [7] for a total of $ 265,000. A deduction of $ 265,000 for "royalties" paid to IBS was claimed on WRC's 1979 tax return. *145 * * * John and Carol controlled the IBS Bank Account. The $ 265,000 payment from WRC to IBS did not represent a royalty payment from petitioners to Dane for work on the Meditator toilet. Brokerage Activity
In early November 1979, checks for $ 100,000 and $ 160,000 were written on the IBS Bank Account and deposited into the WRC Bank Account. John and Carol planned to trade these funds in WRC's name in the stock market. Since January of 1979, WRC had maintained a brokerage account (hereinafter sometimes referred to as "the Brokerage Account") at A. G. Edwards & Sons, Inc. (hereinafter sometimes referred to as "A. G. Edwards"). In early November 1979, a total of $ 258,875 was drawn on the WRC Bank Account and deposited into the Brokerage Account. During 1979 and 1980, funds were transferred back and forth between the WRC Bank Account, the IBS Bank Account, the Brokerage Account, and other accounts held in the name of WRC. WRC received $ 578 and $ 906 in dividend income from the Brokerage Account in 1979 and in 1980, respectively; this income was reported on WRC's 1979 and 1980 tax returns. WRC received $ 9,422 and $ 9,466 in interest income from the Brokerage Account in *146 1979 and 1980; this income was reported on WRC's 1979 and 1980 tax returns. WRC received $ 10,219 and $ 36,171 in net short-term capital gain from the Brokerage Account in 1979 and 1980, respectively; this income and the underlying capital gain and loss transactions were reported on WRC's 1979 and 1980 tax returns. The $ 10,219 reported on WRC's 1979 tax return resulted from 34 sales, with an aggregate gross sales price of $ 268,521 and an aggregate cost or other basis of $ 258,302; each of the 34 sales produced a short-term gain or loss. The $ 36,171 reported on WRC's 1980 tax return resulted from 310 sales, with an aggregate gross sales price of $ 2,951,233.24 and an aggregate cost or other basis of $ 2,916,502.42; [8] each of the 310 sales produced a short-term gain or loss. *147 A. G. Edwards did not charge interest to WRC on account of the Brokerage Account in 1979. A. G. Edwards charged interest in the amount of $ 241.66 to WRC on account of the Brokerage Account in 1980. WRC deducted interest in the amounts of $ 6,463 and $ 13,205 on its 1979 and 1980 tax returns, respectively. In the notice of deficiency, respondent disallowed both amounts in full. Whitehouse Engineering Fees
On January 2, 1979, WRC (by John, as trustee) and Whitehouse Engineering (by John, as president) signed an "Engineering, Design and Consulting Contract". A deduction of $ 23,500 for "engineering fees" was claimed on WRC's 1979 tax return in connection with WRC's expenses under this contract. On January 2, 1980, WRC and Whitehouse Engineering (by John as trustee and as president, respectively) signed a second "Engineering, Design and Consulting Contract". A deduction of $ 30,075 for "consulting fees" was claimed on WRC's 1980 tax return in connection with WRC's expenses under this contract. Arthur H. Edwards & Co.
Petitioners received an invoice from an accounting firm, Arthur H. Edwards & Co. (hereinafter sometimes referred to as "Arthur H. Edwards"), addressed *148 to John Whitehouse Engineering, and dated December 21, 1979. The invoice states that the fee is for "Services rendered in preparation of making projections, cost analysis in connection with 'The Meditator'." Beneath the balance due amount are the words "Water Resource Control Expense" in parentheses. By a check dated October 30, 1979, and drawn on a "Daily Cash Accumulation Fund", petitioners paid $ 5,000 to Arthur H. Edwards on account of the invoice. On WRC's 1979 tax return, this $ 5,000 expense was deducted as having been paid for "legal and professional expenses." [9]
The Limousine
On or about October 29, 1979, John bought a used 1976 Cadillac Fleetwood limousine (hereinafter sometimes referred to as "the Limousine"), with a $ 10,000 check drawn on the WRC Bank Account. (See table 2, supra, check to Elaine J. Wold.) The *149 Limousine was registered in Connecticut in John's name, and was still in John's possession at the time of the trial. An investment credit of $ 333 and a deduction of $ 1,000 for depreciation on the Limousine were claimed on WRC's 1979 tax return. Deductions of $ 726 for "auto expense", $ 294 for "insurance", and $ 125 for "rent" on account of the Limousine were claimed on WRC's 1980 tax return. Midas
John and Carol went to Florida in October or November 1979 and stayed until the spring of 1980. John and Carol opened a bank account in Florida in the name of Midas Management Association, Ltd. (hereinafter sometimes referred to as "Midas"). Petitioners transferred funds from the WRC Bank Account to the IBS Bank Account, and then moved money from the IBS Bank Account to the Midas bank account in Florida. A total of about $ 125,000 in transfers to Midas in Florida between 1979 and 1980 was ultimately deposited into the Brokerage Account. WRC's Tax Returns
On its 1979 fiduciary tax return (Form 1041), WRC reported $ 293,805 of business income and $ 301,258 of business expenses, for a loss of $ 7,433. WRC reported $ 20,228 of other income, $ 400 of miscellaneous deductions *150 (for taxable income of $ 12,395), and a tax liability of $ 2,494 (after investment credit of $ 333). On its 1980 fiduciary tax return (Form 1041), WRC did not report any business income or expenses. WRC reported $ 46,543 of total income, $ 44,585 of interest and other expenses, $ 400 of miscellaneous deductions (for taxable income of $ 1,558), and a tax liability of $ 228. WRC's reported income consists of dividends ($ 906), interest ($ 9,466), and capital gain ($ 36,171). * * * The parts of the deficiencies due to the claimed royalty deduction (1979), the claimed Limousine deductions (1979 and 1980), the claimed Limousine investment credit (1979), and the claimed engineering and consulting fees deductions (1979 and 1980) are due to negligence or intentional disregard of rules and regulations. OPINION I. Expenses and Credits
In a sense, the tax status of WRC might be viewed as a threshold issue, to be dealt with before proceeding to the specific adjustment items. However, the analyses of a number of the specific adjustment items constitute predicates for parts of the analysis of the WRC status issue. We have concluded that the instant opinion would be clearer if we *151 proceeded first to deal with the specific adjustment items. A. Royalty Expense
Petitioners assert that the claimed 1979 $ 265,000 royalty payment to IBS has been substantiated, and that the payment is properly deductible currently, under section 174. Respondent contends that petitioners have not substantiated a payment of $ 265,000 in royalties to IBS, since the ostensible payment by WRC to IBS was followed promptly by IBS' transferring funds to WRC. Respondent argues that if the payment occurred, then it is not deductible, but rather must be capitalized under section 174. Petitioners respond that the transfer from IBS to WRC was a loan. We agree with respondent that there was no payment of royalties. Section 162(a) [10] allows a taxpayer to deduct the ordinary and necessary expenses of carrying on that taxpayer's trade or business. *152 We have found that the IBS Bank Account was controlled and directed by John and Carol. On October 27, 1979, WRC made two checks payable to IBS, for a total of $ 265,000. (See n.7, supra.) The checks were deposited into the IBS Bank Account on October 29, 1979. (Table 4, supra.) On November 1 and November 6, 1979, IBS made two checks payable to WRC, for a total of $ 260,000. (Table 5, supra.) The checks were deposited into the WRC Bank Account on November 2 and November 6, 1979. [11] (Table 1, supra.) Thus the money paid by WRC to IBS was returned by IBS to WRC within a week. Both John and Carol testified that IBS loaned the money back to WRC. [12] Petitioners did not produce any documentary evidence of *153 the loan. Petitioners did not produce Dane or anyone else who could testify on behalf of IBS. Petitioners did not explain why, if one loan of $ 265,000 was intended, then IBS made the loan in two checks rather than one and why the checks were dated 5 days apart from each other (i.e., Nov. 1 and Nov. 6). Also, as tables 4 and 5, supra, show, almost all the money deposited in the IBS Bank Account made its way back to the WRC Bank Account or to the Midas bank account, another account established by John and Carol. *154 We conclude, and we have found, that the $ 265,000 transfer from the WRC Bank Account to the IBS Bank Account was not a payment of royalties. Indeed, we believe it is more likely than not that it was part of a "shell game" in which funds were moved from one pocket to another -- all pockets being under the control of John and Carol -- in an attempt to create an illusion of business transactions, or other real-world transactions. We believe there was no substance to these transfers. We hold for respondent on this issue. B. Whitehouse Engineering Fees
We hold, infra, that WRC is a grantor trust and its income and expenses are taxable to John. Respondent concedes that, to the extent any amounts received from WRC were reported on John's and Carol's tax returns as Whitehouse Engineering's receipts, the disallowance of these deductions ($ 23,500 for 1979; $ 30,075 for 1980) to WRC (and thus, to petitioners) would result in a duplication of income. If the deducted amounts were not reported as Whitehouse Engineering receipts, then allowance of a deduction to WRC would (through the grantor trust provisions) result in overstating John's deductions (or understating his business *155 income). Petitioners have not produced any persuasive evidence to show that the amounts had in fact been reported by Whitehouse Engineering. We conclude that because petitioners have failed to establish that Whitehouse Engineering reported the payments as income, the payments are not deductible as engineering and consulting fees. We hold for respondent on this issue. [13]
C. Bank *156 Charges
WRC deducted $ 25 as "Bank charges" on its 1979 tax return. Respondent contends that petitioners are not entitled to any of this amount, because it has not been substantiated. Petitioners argue that they have documented the bank charges through production of petitioners' bank records. We agree largely with respondent. Neither side has favored us with a reference to any evidence in the record bearing on this matter. However on the basis of the stipulated statements of the WRC Bank Account, we have made the findings set forth in table 3, supra.
We hold on this issue that WRC paid $ 3.48 in bank charges in 1979. D. The Limousine
Respondent contends that petitioners are not entitled to their 1979 claimed depreciation deduction and investment credit and their 1980 claimed auto expense, insurance, and rent deductions on account of the Limousine because (1) petitioners have not shown that the Limousine was used in their trade or business and (2) as to the 1980 deductions petitioners have not shown that money was spent for the claimed purposes. Petitioners argue that the Limousine was so used and the money was so spent. We agree with respondent's first contention. *157 The business use of the Limousine, according to John, was to ferry potential investors from an airport in Florida, to a site that WRC had leased from the city of Sebastian, Florida, for a pilot plant to manufacture the Meditator toilet. The toilets were not manufactured. The plant was not built. We are told that the lease expired. We have no documentary evidence of the lease. We have no evidence as to the Limousine's mileage in this shuttle operation. We have no evidence as to who came to view the plant site and when. We know that the Limousine was registered in Connecticut, despite its asserted Florida usage. We know that the Limousine was registered in John's name despite its asserted purchase for WRC's business purposes. Also, as to 1980 we are not persuaded that there was any WRC trade or business to which the Limousine could reasonably have been related. All of WRC's 1980 income was passive or derived from hundreds of securities transactions. All in all, based on the meager information in the record on this point, we conclude that petitioners have failed to persuade us that there was any trade or business use of the Limousine in either of the years before the Court. *158 The claimed credit and claimed deductions are not allowable in the absence of trade or business use. Accordingly, petitioners are not entitled to the claimed credit or any of the claimed deductions. We hold for respondent on this issue. E. Interest
The status of the parties' dispute is unclear. WRC claimed interest deductions of $ 6,463 for 1979 and $ 13,205 for 1980. Respondent disallowed both items in full. At trial, it appeared that the foundation for the claimed deductions was three checks, each in the amount of $ 6,462.50, from WRC's daily accumulation account with A. G. Edwards and deposited into the IBS Bank Account (see table 4, supra). Carol testified that she thought these checks represented WRC's payments of interest to IBS on IBS's asserted $ 265,000 loan to WRC. The next day, petitioner's counsel stated as follows after Carol completed her testimony: MR. IZEN: What I want to make clear is that it appears that there was an effort to pay IBS back, and the Petitioners are conceding that they never paid IBS back. Yesterday, Mrs. Whitehouse's testimony mentioned something, I think, about interest on the loan for -- that IBS made to Water Resources. *159 Well, the principal was never paid back of the loan. Even if you could those three $ 6,400 and-some-odd-dollar checks that are from that daily cash accumulation fund, you don't come up with any extra monies that Water Resource Control made for an interest deduction. So we concede that. That those $ 6,000 accumulation fund checks are in no way deductible to pay -- those funds represent part of the original loan proceeds.
Respondent agreed at that time that any interest expense shown on the Brokerage Account records is deductible. On brief, respondent concedes that interest of $ 241.66 was paid. On opening brief, petitioners' only reference to the interest issue is the following request for a finding of fact: 92. Petitioners incurred an additional $ 280.00 in deductible interest over and above that allowed by Respondent's Notices of Deficiency. (TR P. 293, LL 1-19).
On answering brief, petitioners reject the idea that they have conceded the interest deductions that WRC claimed on its tax returns. We agree with respondent. Firstly, petitioners' counsel's statements at trial and on opening brief constitute a concession of the interest deductions claimed on WRC's tax *160 returns. Secondly, there was no debt from WRC to IBS and so no foundation for a liability for interest. (See our discussion under A. Royalty Expense, supra.) That is, the transfers from WRC to IBS and back were merely circular and not a payment of royalties followed by a loan. Thirdly, tables 4 and 5 and the text immediately following show that all the proceeds of the three checks from WRC to IBS, that assertedly constitute the payments of interest, found their way back to WRC or to John and Carol's other creation, Midas. Fourthly, we have examined the stipulated Brokerage Account records in detail. Our conclusion as to interest expense matches respondent's concession of $ 241.66, and we have so found. Petitioners have not favored us with any explanation of the $ 280 amount they refer to. We hold for respondent on this issue. F. Fee -- Arthur H. Edwards
Respondent contends that petitioners may not deduct the $ 5,000 fee paid in 1979 to Arthur H. Edwards for services rendered in making projections and cost analyses in connection with the Meditator toilet, because it is an organizational expense that must be capitalized (sec. 263). Petitioners contend that the *161 payment is deductible for 1979 as an ordinary and necessary trade or business expense (sec. 162) or an expense of earning income (sec. 212). We agree with respondent. We take at its face value some of John's and Carol's testimony about WRC's preparing to go into business to exploit the Meditator toilet in some manner. Although WRC had received almost $ 300,000 from the sale of distributorships, nothing was yet done to enable WRC to have the Meditator toilet manufactured. Under these circumstances, the work done by Arthur H. Edwards, to the extent it is characterized by evidence in the record, appears to be "start-up" or "preopening" activity, the cost of which ordinarily is to be capitalized, under the "preopening expense doctrine". The expense is not currently deductible under section 162 or section 212. Hardy v. Commissioner, 93 T.C. 684 (1989), on appeal (CA10, April 20, 1990). We hold for respondent on this issue. [14]
*162 G. Miscellaneous Items
Respondent contends that petitioners are not entitled to deductions of $ 250 for office supply expenses in 1979 or $ 160 for dues paid to the Hartford Club in 1980. Petitioners have failed to provide any evidence or testimony that would substantiate these deductions and credits. Thus, petitioners have not met their burden of proof with respect to these items. We hold for respondent on these issues. H. Sale of Meditator Rights
Petitioners argue that John and Carol are entitled to capital gains treatment on the payment from the Meditator Company to WRC for the rights to the Meditator toilet. Respondent contends that because petitioners treated this income as ordinary income on the tax returns that they filed on behalf of WRC, petitioners are bound by such treatment. We agree with petitioners. Section 1235(a) provides that a transfer of "all substantial rights" to a patent by any holder shall be considered the sale or exchange of a capital asset. [15] *164 In the instant cases, the Meditator toilet was never actually patented. However, it is not necessary that the patent or patent application for the invention be in existence if the requirements *163 of section 1235 are otherwise met. [16] We conclude that the requirements of section 1235 are indeed otherwise met. The Distribution Agreement states as follows: WRC hereby assigns to TMC [the Meditator Company] all right, title and interest in and to the invention of the Meditator toilet for the United States only, including the right to sub-license others, to make, use and sell Meditator toilets incorporating or made in accordance with or by use of the design, engineering and manufacturing data and know-how of WRC or John H. Whitehouse or which is or may become covered by one or more U.S. Patent Rights of WRC. * * *
The only rights in the Meditator toilet that WRC retained were (1) the non-U.S. rights; (2) the right to bring an action against third-party patent infringers, but only with the permission or failure to act of the Meditator Company; and (3) the right to terminate the agreement if the Meditator Company were to become insolvent or default on its payments to WRC. It is clear that retaining such rights does not result in a determination that less than all substantial rights were transferred to the purchaser. Taylor-Winfield Corp. v. Commissioner, 57 T.C. 205 (1971), affd. 467 F.2d 483 (CA6 1972); Young v. Commissioner, 29 T.C. 850 (1958), *165 affd. 269 F.2d 89 (CA2 1959). We conclude that, under the Distribution Agreement, WRC transferred all substantial rights in the Meditator toilet to the Meditator Company. Thus, the transfer of the rights was a sale under section 1235, and petitioners are entitled to treat the $ 293,805 as a capital gain. We hold for petitioners on this issue. II. Tax Treatment of WRC
Respondent would tax WRC's income to John [17] either because WRC was part of Whitehouse Engineering (John's sole proprietorship), or because WRC was a grantor trust (with John as the "grantor"). Petitioners maintain that WRC is a separate entity, taxable as a corporation on its own income. [18]
*166 We first consider whether WRC is an "association" taxable as a corporation, then whether WRC is a grantor trust. [19]
*167 A. Association Status
Petitioners argue that WRC is a "business trust", taxable as a corporation. They contend that WRC has all six of the major characteristics which, Treasury Regulations state, are ordinarily found in corporations. Petitioners stress Carol's role in WRC as being sufficient to satisfy the requirement that WRC have associates. Respondent maintains that the only relevant characteristics are "associates" and "business purpose", that there were no associates (focussing on Carol), and that no business purpose has been established. We agree with respondent that Carol was not an associate and that WRC is not taxable as a corporation. Section 7701(a)(3)[20] defines "corporation" to include "associations". A trust may be classified as an association (and thus may be taxable as a corporation) but only if it has more corporate characteristics than noncorporate characteristics. Morrissey v. Commissioner, 296 U.S. 344, 356-357, 80 L. Ed. 263, 56 S. Ct. 289 (1935); Sec. 301.7701-2(a)(3), Proced. & Admin. Regs. *168 Section 301.7701-2(a)(1), Proced. & Admin. Regs., lists the following six characteristics to be considered in determining whether an organization is to be classified as an association: (i) Associates, (ii) an objective to carry on business and divide the gains therefrom, (iii) continuity of life, (iv) centralization of management, (v) liability for corporate debts limited to corporate property, and (vi) free transferability of interests. Morrissey v. Commissioner, 296 U.S. at 356, 359. In evaluating these elements, although "the use of corporate forms may furnish persuasive evidence of the existence of an association, the absence of particular forms, or of the usual terminology of corporations, cannot be regarded as decisive." Morrissey v. Commissioner, 296 U.S. at 358; United States v. Davidson, 115 F.2d 799, 801 (CA6 1940); sec. 301.7701-4(b), Proced. & Admin. Regs. The last four characteristics listed above are common to both trusts and corporations, and thus are not helpful in distinguishing between the two types of entities. Bedell Trust v. Commissioner, 86 T.C. 1207, 1217 (1986); Elm Street Realty Trust v. Commissioner, 76 T.C. 803, 809 (1981). *169 Accordingly, we focus our inquiry on whether the first two characteristics ((i) associates, and (ii) an objective to carry on business and divide the gains therefrom) are present in the instant cases. Sec. 301.7701-2(a)(2), Proced. & Admin. Regs. We consider first the associates test. In Morrissey v. Commissioner, 296 U.S. at 356, the Supreme Court laid down the rule that -- 3. "Association" implies associates. It implies the entering into a joint enterprise, and, as the applicable regulation imports, an enterprise for the transaction of business."
The Supreme Court went on to state (296 U.S. at 358) that a trust may be classified as a corporation even if the beneficiaries do not have such control as is commonly exercised by stockholders and even if they do not hold meetings to elect representatives. See Hecht v. Malley, 265 U.S. 144, 68 L. Ed. 949, 44 S. Ct. 462 (1924). In Elm Street Realty Trust v. Commissioner, this Court held that beneficiaries with limited powers were not associates, stating as follows (76 T.C. at 814): The beneficiaries' role in creating a trust may provide an indication of a planned, common effort. *170 Active participation in establishing the entity evinces a voluntary association for engaging in a joint endeavor. On the other hand, the lack of the current beneficiaries' role in the trust's creation does not mandate a finding that they are not "associates." * * * As to those cases where the beneficiaries have either not participated in the trust's creation, or affirmatively entered into the enterprise (e.g., by way of a purchase of their beneficial interests), some further voluntary activity may be necessary on their part to satisfy the "associates" requirement. * * * Where nongrantor beneficiaries receive their beneficial interests gratuitously, without solicitation, it is doubtful that they can be considered associated together in a common enterprise in the absence of some further joint activity (or at least the potential therefor) vis-a-vis the trust.
In Bedell Trust v. Commissioner, supra, this Court held that the beneficiaries of a testamentary trust were not "associates" because (1) they neither created nor contributed to the trust, (2) their interests in the trust were not transferable, and (3) only three out of ten of them participated as trustees *171 in the trust's affairs. Thus, the Court determined that the trust was not an association taxable as a corporation. Creation of Trust
The preamble to the Trust Instrument (set forth in our Findings of Fact, supra) shows John as the only person whose property is to go into WRC. The only property transferred into WRC at its creation was the Meditator toilet. The parties agree that John invented the Meditator toilet and neither side contends that Carol had an interest in the Meditator toilet. Thus, Carol's initial 50 certificates of beneficial interest were not in exchange for her investment or contribution of property to WRC. Also, Carol's receipt of John's 50 certificates for $ 1, on the date WRC was created, does not mean that Carol "affirmatively entered into the enterprise" ( Elm Street Realty Trust v. Commissioner, 76 T.C. at 814). Transferability
Carol could not transfer her certificates without the trustee's approval, under the provisions of the Trust Instrument. The Trust Instrument also provides that the trust could be terminated or renewed beyond its stated 10 years at the complete discretion of the trustee. Accordingly, Carol had neither *172 control nor assurance of how long she would be locked into her ownership of the certificates. Active Participation
Under the Trust Instrument, Carol was specifically denied (1) any authority to transact business for WRC, (2) any interest in WRC's property, (3) any right to a partition of WRC's property, and even (4) any right to an accounting during WRC's existence. Carol's role in WRC's operations was to keep the books for WRC. At trial, Carol put it this way: Q. [Izen] Who made the decisions? Who had the final say so with what was going to be done with the property of Water Resource Control and the assignment rights that it had in the toilet? A. John Whitehouse. Q. All right. Did you have any sort of input in the decisions that were made, business-wise? A. No. Q. Did Mr. Whitehouse consult you before they were made in any decisions? A. Did he consult me about business decisions? Q. Yes. The decisions -- A. No. He made his own business decisions. He's been doing that for a long time.
Accordingly, we conclude that Carol did not participate actively in WRC's creation or conduct. Taking into account the elements described in Elm Street Realty *173 and Bedell, it follows that Carol was not an "associate" and so WRC does not meet the "associates" test. The absence of either associates or a business purpose will cause a trust to be classified as other than an association. Bedell Trust v. Commissioner, 86 T.C. at 1218. Accordingly, WRC does not qualify as an association taxable as a corporation under section 7701(a)(3). We hold for respondent on this issue. [21]
*174 B. Grantor Trust Rules
Having concluded that WRC is subject to taxation as a trust rather than as a corporation, we next consider whether it is a grantor trust (secs. 671 et seq.), and whether its income and expenses are directly taxable to John under section 671. Respondent argues that John possessed such dominion and control over the corpus and income of WRC that WRC is subject to the grantor trust rules and John should be treated as WRC's owner. Petitioners maintain that any control exercised by John over the trust corpus was consistent with the business purpose of WRC. Thus, petitioners contend, the grantor trust provisions do not apply. We agree with respondent. Grantor
We begin by noting that the Trust Instrument states that Jenkins is the "Creator" of the trust while John is the "Investor Exchangor". Although the creator of a trust is usually the grantor of that trust, this classification results only because the creator is usually the person who transfers property to the trust. In the instant case, John was the one who transferred property (the Meditator toilet), thereby creating the res of the trust. Jenkins then appointed John the trustee of WRC. Except *175 for the nature of the property transferred to the trust, the instant cases are even stronger for respondent on this issue than what we faced in Bixby v. Commissioner, 58 T.C. 757, 789-791 (1972). Thus, we conclude that John (and not Jenkins) is the grantor of WRC, within the meaning of the grantor trust provisions. If the grantor of a trust has any of the powers enumerated in sections 673 through 677, then, for income tax purposes, the grantor is treated as the owner of that portion of the trust over which the proscribed powers extend. Where the grantor is so treated, section 671[22] includes in the grantor's income "those items of income, deductions, and credits * * * of the trust which are attributable to that portion of the trust to the extent that such items would be taken into account * * * in computing taxable income or credits * * * of an individual." *176 Adverse Party
Generally, and in the instant cases, we first consider whether the grantor may exercise a power without the consent of an adverse party, as defined in section 672. [23]Wesenberg v. Commissioner, 69 T.C. 1005, 1012 (1978). An adverse party is any person with a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which the grantor possesses respecting the trust. A nonadverse party is anyone who is not an adverse party. *177 Ordinarily, a beneficiary is an adverse party. Phipps v. Commissioner, 137 F.2d 141 (CA2 1942), affg. in part and revg. in part 47 B.T.A. 357 (1942). However, where the trustees have no obligation to make any payments to a beneficiary, the beneficiary does not have a substantial interest, and thus is not an adverse party. Fulham v. Commissioner, 110 F.2d 916 (CA1 1940), affg. 40 B.T.A. 48 (1939). Section 166 of the Revenue Act of 1932 is the predecessor of section 676(a), and embodies what for our purposes is essentially the same concept of the circumstances under which a person would be regarded as having a substantial interest adverse to the grantor. In describing the policy of section 166 of the Revenue Act of 1932, the Circuit Court of Appeals for the First Circuit stated as follows ( Fulham v. Commissioner, 110 F.2d at 918): The evident policy of the Revenue Act is to tax the income to the grantor of a trust when he retains the substantial mastery over the corpus. Even though in form he lodges the power of revocation in someone other than himself, Section 166 is founded on the *178 reasonable premise that the grantor still retains practical mastery, when this power is given to someone having no stake in the trust, or a stake so insubstantial that the holder of the power would not improbably be amendable to the grantor's wishes. This calls for a realistic appraisal.
See Chase National Bank v. Commissioner, 225 F.2d 621, 627-628 (CA8 1955), affg. D.G. McDonald Trust v. Commissioner, 19 T.C. 672, 690-692 (1953), applying the same approach in dealing with sections 166 and 167(a) of the Internal Revenue Code of 1939, the predecessors of sections 676(a) and 677(a). As we put it more recently in Paxton v. Commissioner, 57 T.C. 627, 631 (1972), affd. 520 F.2d 923 (CA9 1975) -- The question of adverse interest is essentially one of fact, which must be determined by considering in each case the particular interest created by the trust instrument and the relative size of that interest. Similarly, whether the particular interest, regardless of size, is of an adverse nature must be determined under the facts of each case. * * *
With the foregoing in mind, we consider whether Carol *179 was an adverse party, within the meaning of section 672(a). Carol was the sole beneficiary (Certificate Holder) of WRC, and John was the sole trustee. The Trust Instrument states that "Certificate Holders as such have absolutely no rights in the management of this Trust Organization, nor in the selection or replacement of its Trustees, nor control over them." The Trust Instrument gives to Carol the right "to participate in all surplus and other distributions of net income as the Trustees from time to time may declare and pay out. This is an option, and not a duty." The Trust Instrument provides that "No Certificate Holder shall have any right to a partition of the trust property or to an accounting during the continuance of the trust." In case there is any doubt about the insubstantiality of Carol's interest, that is laid to rest by the specific authority given to the trustee to amend any part of the Trust Instrument except the provision protecting Certificate Holders from (1) assessments and (2) personal liability for any actions of the trust. Thus, even Carol's right to distributions might be eliminated by John's unilateral action. Accordingly, we conclude that Carol was not *180 an adverse party as defined in section 672. Thus, John was free to exercise whatever powers he had over WRC without the consent of an adverse party. Powers
John, as grantor, is treated as the owner of any portion of WRC as to which he has the power to dispose of the beneficial enjoyment of corpus or income (sec. 674(a)), or exercise certain administrative powers (sec. 675), or revest title in himself (sec. 676(a)), or distribute currently or hold for the future WRC income to himself or Carol (sec. 677(a)). All of those powers John had or could have had by his essentially unfettered power to amend the Trust Instrument. Based on these facts, we conclude that John possessed the requisite control over the corpus and income of WRC for him to be treated as the "owner" thereof under section 674 through 677. Accordingly, the income and expenses reported by WRC are includable under section 671 in computing petitioners' taxable income and credits. We hold for respondent on this issue. [24]
*181 III. Negligence Addition
Respondent maintains that part of petitioners' underpayment of tax for each of the taxable years 1979 and 1980 is due to negligence or intentional disregard of rules and regulations. Petitioners argue that they acted prudently by consulting both an accountant and an attorney for both the 1979 and 1980 tax returns. We agree with respondent. Petitioners have the burden of proving respondent erred in determining that they are liable for additions to tax under section 6653(a)[25] for each of the years in issue. Bixby v. Commissioner, 58 T.C. at 791-792. *182 We believe that it is significant that neither the accountant nor the attorney was called as a witness. (Petitioners had listed their accountant as a witness on their pretrial memorandum.) Nor was any documentary evidence provided, such as bills or correspondence with these professional advisors. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (CA10 1947). Even if they had appeared, we doubt they could have justified the asserted royalty payment to IBS followed almost immediately by the "loan" from IBS to WRC. During the years before the Court, funds were passed around between the WRC Bank Account, the IBS Bank Account, the Midas bank account, and the Brokerage Account in a manner that makes it plain that the three accounts were merely alternate pockets for petitioners. We are convinced that the deficiency attributable to the royalty deduction is due to negligence or intentional disregard of rules and regulations. Similarly, petitioners have failed to substantiate the trade or business character of any of the claims of deductions (for 1979 and 1980) and investment credit (for 1979) on account *183 of the Limousine. At best, they were negligent in failing to make and maintain business records; at worst, they intentionally disregarded rules and regulations in claiming the deductions and credit. The deficiencies attributable to those items are due to negligence or intentional disregard of rules and regulations. The claimed deductions of consulting fees were entirely unfounded (the 1980 claim being particularly egregious); the resulting deficiencies also are due to negligence or intentional disregard of rules and regulations. Thus, we conclude that petitioners are liable for the addition to tax for negligence under section 6653(a) for both 1979 and 1980. We hold for respondent on this issue. To take account of the foregoing and concessions by respondent, Decision will be entered under Rule 155 in docket No. 18690-83.
Decision will be entered for petitioner in docket No. 18689-83.
Footnotes
1. Unless indicated otherwise, all section, subpart, part, subchapter, and chapter references are to sections, subparts, parts, subchapters, and chapters of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
2. $ 182,486.40 of this amount is chapter 1 income tax; the remaining $ 1,854.90 is self-employment taxes under chapter 2.↩
3. Respondent concedes that the two dockets involve a duplication of income. Respondent also states that his main position is that the income and expenses of petitioner Water Resource Control (hereinafter sometimes referred to as "WRC") are taxable to petitioners John H. Whitehouse (hereinafter sometimes referred to as "John") and Carol A. Whitehouse (hereinafter sometimes referred to as "Carol"). We interpret this to mean that, if we hold for respondent on his main position, against John and Carol in docket No. 18690-83, then respondent concedes the entire deficiency determined against WRC in docket No. 18689-83. Also, see n.17, infra↩. Petitioners do not dispute John's and Carol's liability for self-employment taxes if we rule for respondent on the issues for decision.
4. The stipulations and exhibits refer to Dane's company at various times as "International Business Services, Ltd.", and "International Business Services Association Ltd."↩
5. In his testimony, John describes WRC as a "Massachusetts business trust". Neither side has dealt with the question of whether WRC would so qualify under Massachusetts law (or under the corresponding Connecticut law, the law of the State in which WRC was domiciled and in which was located WRC's principal place of business and principal office).↩
6. The only property listed on Schedule A to the Trust Instrument is the Meditator toilet. There is not any Schedule B to the Trust Instrument.↩
*. A "damaged film" reference means that the bank stated that it was unable to reproduce a photocopy of the item due to damaged film.↩
**. The "NA" reference means that the information is not available from the records.↩
*. The "daily cash accumulation fund" appears to refer to a brokerage account with A.G. Edwards & Sons, Inc., on which WRC could draw funds.↩
7. The $ 52,000 check was drawn on WRC's account with another bank, the Northern Connecticut National Bank.↩
8. One of the transactions, shown as "Put Nom June 35", appears to have produced a loss of $ 720.03 (gross sales price of $ 308.75, cost or other basis of $ 1,028.78). However the $ 720.03 is shown in the "GAIN" column. It thus appears that WRC overstated its capital gains by $ 1,440.06. This, plus rounding, accounts for the difference between (1) WRC's reported capital gains and (2) the excess of the aggregate of WRC's reported gross sales price over the aggregate of WRC's reported cost or other basis.↩
9. We are puzzled by the use of a check dated October 30, 1979, to pay an invoice dated December 21, 1979. However, the parties' stipulations so state, and accordingly we so find.↩
10. Section 162(a) provides, in pertinent part, as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *↩
11. Each of the checks from WRC to IBS is endorsed as follows: "Deposit in full International Business Assoc LTD". To the Court, the handwriting is similar to Carol's. However, Carol categorically denies having written the endorsements, and so we have not made any finding of fact on that point.↩
12. Carol's testimony and petitioners' brief insist that the loan was in the amount of $ 265,000, even though the checks from IBS ($ 100,000 and $ 160,000) clearly added up to only $ 260,000. Petitioners have not offered any explanation for the $ 5,000 shortfall. Also, Carol testified that the $ 25,000 check from IBS to Midas (table 5, supra↩) was part of the IBS loan to WRC. This would make the total loan $ 285,000 ($ 100,000 and $ 160,000 and $ 25,000). Petitioners have not offered any explanation for what appears to be a $ 20,000 overage, under their theory of the case.
13. Both respondent and petitioners discuss (a) whether the payments have been substantiated, and if so, then (b) whether they are properly deductible. We do not reach these questions, since we conclude that petitioners have not established that Whitehouse Engineering reported these amounts as income. However, we note that petitioners have failed to produce any evidence regarding these expenses, other than invoices from Whitehouse Engineering to WRC. Also, it is difficult to relate the 1980 expense of $ 30,075 to any business activity of WRC. All of WRC's 1980 income was passive or derived from hundreds of securities transactions.↩
14. Petitioners' contentions relate to 1979 deductibility. However, it might be argued that, by the end of the period before us (i.e., 1980), the work done by Arthur H. Edwards had been abandoned. (John abandoned his efforts to secure a patent; WRC did not show any business income or business expenses on its 1980 tax return; WRC's 1980 activities were limited to hundreds of purchases and sales of securities.) Under our precedents, even if the abandonment argument had been made, the expense would not be deductible under section 165. O'Donnell v. Commissioner,62 T.C. 781, 786 (1974), affd. without published opinion 519 F.2d 1406↩ (CA7 1975).
15. SEC. 1235. SALE OR EXCHANGE OF PATENTS. (a) General. -- A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 1 year, regardless of whether or not payments in consideration of such transfer are -- (1) payable periodically over a period generally coterminous with the transferee's use of the patent, or (2) contingent on the productivity, use, or disposition of the property transferred. [The subsequent amendment of this provision by sec. 1001(b)(19) of the Deficit Reduction Act of 1984 (Pub. L. 98-369, 98 Stat. 494, 1012) does not affect the instant cases.]↩
16. Sec. 1.1235-2. Definition of terms. -- For the purposes of section 1235 and § 1.1235-1 -- (a) Patent. The term "patent" means a patent granted under the provisions of title 35 of the United States Code, or any foreign patent granting rights generally similar to those under a United States patent. It is not necessary that the patent or patent application for the invention be in existence if the requirements of section 1235↩ are otherwise met.
17. Respondent concedes that there is a duplication of the income items in the two dockets before us. Respondent concedes that, if we hold that John is taxable on WRC's income, then John should also be entitled to the deductions attributable to those items. See n.3, supra↩.
18. At trial, petitioners' first alternative was that WRC should be taxed as shown on its tax returns; i.e., a trust which is not a grantor trust. Association status was a second alternative. On brief, petitioners have reversed the order of their preferences.↩
19. At trial, a question arose as to whether John remains the fiduciary of WRC, in light of his testimony that he had turned WRC over to Dane in 1983. Dane was described as a British national who worked as an undercover agent monitoring German espionage activities in the United States before World War II, and who had lived in various places in the Caribbean and South America. What purports to be Dane's signature appears on various checks and other documents. He fits, more or less, into petitioners' story at convenient spots. The asserted transfer of WRC to Dane in 1983 is John's and Carol's explanation for their inability to produce numerous requested documents. (We note that, in 1982, respondent's auditor asked John to produce WRC's records for 1979 and 1980. Thus, John's testimony is that he got rid of WRC's records after he knew that respondent wanted them.) We are not completely convinced that Dane existed. Dane did not appear at the trial. Petitioners did not produce anyone other than John and Carol to testify as to Dane's existence. We suspect that he might be a "fudge factor", created to fill in gaps in explanations. Some may liken him to Harvey the rabbit, much talked about but never seen nor heard except by John and Carol. (See Vicknair v. Commissioner, T.C. Memo 1990-434, slip op. at 19.) On balance, we have concluded that it is more likely than not that Dane existed. We do not believe he played all the roles that John and Carol have testified to. In particular, we do not believe that John turned WRC over to Dane. In this regard, we accept the implied representations by John that he was and continued to be WRC's fiduciary.↩
20. SEC. 7701. DEFINITIONS. (a) When used in this title [i.e., title 26, the Internal Revenue Code], where not otherwise distinctly expressed or manifestly incompatible with the intent thereof -- * * * (3) Corporation. -- The term "corporation" includes associations, joint-stock companies, and insurance companies.↩
21. We note that John might have created WRC as a corporation, but instead he chose to create WRC as a trust. We note that John might have filed corporate income tax returns for WRC, but instead he chose to file fiduciary income tax returns (Forms 1041) for WRC. Thus, in arguing that WRC should be treated as an association taxable as a corporation, petitioners are arguing against the form of operation they chose and that they confirmed on tax returns. Respondent has not contended that petitioners should be precluded from challenging the correctness of petitioners' own choices, and so we do not consider that question. (In each of the cases we have cited on this issue, as well as each of the cases that either of the parties has cited on this issue, the taxpayer sought to defend the taxpayer's choice of the trust form and respondent argued for taxation as a corporation. In none of those cases did the taxpayer seek to repudiate its own choice of form.) See Halstead v. Commissioner, 296 F.2d 61, 62 (CA2 1961), affg. T.C. Memo 1960-106; R. T. Smith, "Substance and Form: A Taxpayer's Right to Assert the Priority of Substance", 44 The Tax Lawyer 137 (Fall 1990). By the same token, petitioners have not contended that John's involvement with WRC is enough by itself to satisfy the "associates" test (see Hynes v. Commissioner, 74 T.C. 1266, 1279-1281 (1980)). Under the circumstances, we decline to explore either of those possible approaches to the instant cases. See Estate of Fusz v. Commissioner, 46 T.C. 214, 215 n.2 (1966). Finally, we do not examine business purpose, the other necessary corporate characteristic. We note that, for 1980, all of WRC's income was passive or derived from hundreds of securities transactions. Petitioners do not claim that in 1980 WRC was in the trade or business of investing. See Commissioner v. Groetzinger, 480 U.S. 23, 94 L. Ed. 2d 25, 107 S. Ct. 980 (1987), especially that opinion's discussion of Snyder v. Commissioner, 295 U.S. 134, 79 L. Ed. 1351, 55 S. Ct. 737 (1935), and Higgins v. Commissioner, 312 U.S. 212, 85 L. Ed. 783, 61 S. Ct. 475↩ (1941).
22. SEC. 671. TRUST INCOME, DEDUCTIONS, AND CREDITS ATTRIBUTABLE TO GRANTORS AND OTHERS AS SUBSTANTIAL OWNERS. Where it is specified in this subpart [subpart E of part I of subchapter J, relating to when grantors and others are treated as substantial owners of trusts] that the grantor or another person shall be treated as the owner of any portion of a trust, there shall then be included in computing the taxable income and credits of the grantor or the other person those items of income, deductions, and credits against tax of the trust which are attributable to that portion of the trust to the extent that such items would be taken into account under this chapter [chapter 1, relating to normal taxes and surtaxes] in computing taxable income or credits against the tax of an individual. Any remaining portion of the trust shall be subject to subparts A through D [general rules governing estates, trusts, and beneficiaries]. No items of a trust shall be included in computing the taxable income and credits of the grantor or of any other person solely on the grounds of his dominion and control over the trust under section 61 (relating to definition of gross income) or any other provision of this title [title 26, the Internal revenue Code], except as specified in this subpart.↩
23. SEC. 672. DEFINITIONS AND RULES. (a) Adverse Party. -- For purposes of this subpart, the term "adverse party" means any person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust. A person having a general power of appointment over the trust property shall be deemed to have a beneficial interest in the trust. (b) Nonadverse Party. -- For purposes of this subpart, the term "nonadverse party" means any person who is not an adverse party.↩
24. Under these circumstances, we do not consider respondent's contention that the separate existence of WRC should be disregarded and WRC treated as merely a part of John's Whitehouse Engineering sole proprietorship.↩
25. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. [The subsequent amendments of this provision by sec. 101 of the Crude Oil Windfall Profit Tax Act of 1980 (Pub. L. 96-223, 94 Stat. 229, 252), by sec. 722 of the Economic Recovery Tax Act of 1981 (Pub. L. 97-34, 95 Stat. 172, 341), by sec. 107(a)(3) of the Technical Corrections Act of 1982 (Pub. L. 97-448, 96 Stat. 2365, 2391), by sec. 1503 of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2742), and by sec. 1015(b) of the Technical and Miscellaneous Revenue Act of 1988 (Pub. L. 100-647, 102 Stat. 3342, 3568), do not affect the instant cases. As a result of sec. 7721(a) and 7721(c)(1) of the Omnibus Budget Reconciliation Act of 1989 (Pub. L. 101-239, 103 Stat. 2106, 2395, 2399), the revised negligence, etc., addition to tax now appears in sec. 6662, I.R.C. 1986↩.]